**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

DONNA JONES,

                Plaintiff,

v.

                Civil Action No.: 1:23-cv-359-AJT-LRV

FAIRFAX COUNTY SCHOOL BOARD,

                Defendant,

---

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
<u>MOTION FOR</u> <u>SUMMARY JUDGMENT</u>**

Laurie L. Kirkland, VSB No. 75320
Dana Leinbach, VSB No. 95866
BLANKINGSHIP & KEITH, P. C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
703-691-1235 (telephone)
703-691-3913 (facsimile)
*Counsel for Defendant Fairfax County School Board*

## **Table of Contents**

Preliminary Statement ........................................................................................................... 1

Statement of Undisputed Material Facts ("SUMF") ........................................................... 1

    Ms.  Jones' Position as a Resource Teacher at Braddock Elementary School ...................... 1

    Concerns of, and Remediation of, Mold *Prior to* Requests for Accommodation ................. 3

    February 2022 Requests for Accommodation ..................................................................... 6

    Ms. Jones Seeks to Revisit Her Accommodations .............................................................. 10

    Final Accommodations Requested for Last Two Weeks of School Year ........................... 12

Argument ............................................................................................................................... 13

I.    The School Board Provided Ms. Jones the Reasonable Accommodations Recommended
by Her Pulmonologist. ............................................................................................... 14

    A.    Consistent with Ms. Jones' Pulmonologist's Recommendations, the School Board
Offered Ms. Jones Sick Leave and Ensured Her Workspaces Were Free of Mold ..... 15

    B.    Consistent with Ms. Jones' Pulmonologist's Subsequent Recommendation, the
School Board Ensured Ms. Jones Worked Only in Areas Not Under Construction ... 18

II.   Ms. Jones' Request to Telework Full-Time Was Not a Reasonable Accommodation As
It Would Not Enable Her to Perform the Essential Functions of Her Position ................... 20

    A.    Ms. Jones Could Not Perform the Essential Functions of Her Job Via Telework,
Five Days a Week ................................................................................................... 20

    B.    Although the School Board Had Granted the Reasonable Accommodations
Recommended by Ms. Jones' Pulmonologist, It Also Granted Her the Limited
Telework It Could Grant Without Eliminating Essential Functions ........................... 25

Conclusion ............................................................................................................................. 25

**Preliminary Statement**

Plaintiff Donna Jones ("Ms. Jones"), an Instructional Resource Teacher for elementary students in math and science, brought this action, claiming that her employer, the Fairfax County School Board (the "School Board"), failed to accommodate her disability of reactive airway disease in violation of the Americans with Disabilities Act, as amended ("ADA") by failing to grant her repeated requests to telework on a full-time basis in the spring of 2022.[1]

As set forth below, Ms. Jones cannot prove even a prima facie case of failure to accommodate because the School Board *granted* Ms. Jones the reasonable accommodations recommended by her pulmonologists, including that the School Board ensured Ms. Jones' workspaces were free of mold, granted her leaves of absences, and relocated her to an area of the school building that was not under construction. Moreover, even if the School Board had not accommodated Ms. Jones in alternative ways, the undisputed material facts demonstrate that, in the spring of 2022, Ms. Jones could not perform the essential functions of her job through her sole preferred accommodation of full-time telework. For these reasons, the School Board is entitled to summary judgment in its favor as the sole remaining failure to accommodate claim in this case.

**Statement of Undisputed Material Facts ("SUMF")**

**Ms.  Jones' Position as a Resource Teacher at Braddock Elementary School**

1.      The School Board, which operates the Fairfax County Public Schools ("FCPS"), employed Ms. Jones as a Resource Teacher, initially for science and then for both math and science, at Braddock Elementary School ("Braddock ES") from August 2019 until June 2022. (Dep. of Donna Jones, attached as Def. Ex. 1, at 13.)

---

[1] Ms. Jones' Complaint also included counts of discrimination and retaliation in violation of the ADA, which claims this Court previously dismissed. (9/20/23 Order (Dkt. No. 16).)

2.       Braddock ES is a Title I school that enrolls approximately 800-900 students from kindergarten through fifth grade. In the spring of 2022, Ms. Jones served as the Science and Math Resource Teacher for the kindergarten through second grade levels. (Def. Ex. 1 at 14-15, 17.)

3.       The essential functions of Ms. Jones' position as a Science and Math Resource Teacher included providing academic interventions to students (such as by testing or working directly with students one-on-one as needed and through Braddock ES's practice of utilizing Resource Teachers as substitute teachers in classrooms); working collaboratively with teachers; meeting weekly with teachers and administration regarding curriculum and to model to teachers how to use scaffolds and materials; and analyzing data and developing curriculum. (Declaration of Keesha Jackson-Muir, attached as Def. Ex. 2, at ¶ 4; Def. Ex. 1 at 15-18, 20, 32, 34-35, 67, 195.)

4.       In fulfilling these functions, Ms. Jones spent much of her day in a resource room in which she managed, ordered, separated, inventoried, and made ready materials for use by teachers in their classrooms so that she could procure resource materials for them as they were needed. (Def. Ex. 1 at 26, 49-50, 67.) When supplies were delivered, she would unpack and inventory them, which she could not do from home. Likewise, when a teacher needed materials, she would pull materials off shelves and lay them out for teachers to grab and use in classrooms, which she also could not do from home. (Def. Ex. 1 at 200.) After procuring materials for teachers, Ms. Jones would meet with some teachers in person, including during the spring of 2022. (Def. Ex. 1 at 129.)

5.       As the principal at Braddock ES explained, "a lot of Ms. Jones' job required being around teachers in school to get everything done." (Dep. of Keesha Jackson-Muir, attached as Def. Ex. 3, at 85.) As such, Ms. Jones could not meet the needs of the students or teachers that she supported from home, because her essential functions required attending in-person classes, co-teaching, working directly with students in the classrooms or one-on-one as needed, and selecting and modeling resources to teachers from the resources room that she managed. (Def. Ex. 2 at ¶ 5.)

2

6.      When Ms. Jones began her position as a Resource Teacher at Braddock ES, her entire job was in-person, on-site. (Def. Ex. 1 at 36.)

7.      In March 2020, the Covid-19 pandemic resulted in schools closing and instruction becoming virtual for all students. During the pandemic when all students attended school virtually, Ms. Jones performed her job virtually as well. (Def. Ex. 1 at 20-21, 95, 201.)

8.      For the remainder of that 2019-2020 school year and for the 2020-21 school year, during which students and teachers began returning part-time while still attending virtually part-time, FCPS lightened the responsibilities for schools as far as instructional standards. Near the end of the 2020-21 school year, FCPS brought staff back full-time. (Def. Ex. 3 at 16, 18-19, and 22.)

9.      Once FCPS brought staff and students back into schools full-time, schools were back to regular operating status, and each employee's job duties prior to Covid again were in effect. (Dep. of Lori Gibson, attached as Def. Ex. 4, at 146.)

10.     Notwithstanding the need to attend school and work virtually during the pandemic, Ms. Jones has agreed that, "obviously, it's better to be there." (Def. Ex. 1 at 201.)

**Concerns of, and Remediation of, Mold *Prior to* Requests for Accommodation**

11.     Prior to renovations beginning in 2021, Braddock ES's school building was shaped like a lower-case "b." (Def. Ex. 3 at 45; *see* Pre-Renovation Map of BES, attached as Def. Ex. 5.) In the spring of 2021, renovations commenced to add a new wing to Braddock ES building so that the building would become shaped like an upper-case "B." (Def. Ex. 3 at 45.)

12.     As the school building would be occupied by staff and elementary school-age children during renovations, which was routine for FCPS, construction was to occur in phases. Phase 1 largely involved constructing the new wing of the school building to form the upper-case "B." Once that newly constructed wing of the building opened and staff and students moved from the original building into the new wing in early-to-mid April 2022, then Phase 2 began, which

3

included renovations to the original building. During the summer of 2021 (a phase known as 1S), when students and staff were not on-site, FCPS renovated the existing gym and converted a few rooms near the cafeteria, including Ms. Jones' original room of 2A, into a temporary library. (Dep. of Jessica Gills, attached as Def. Ex. 6, at 10-12, 15, 18, 36-38, and 71; *see also* Construction Phase Plans of Braddock ES, attached as Def. Ex. 7.)

13.     To prepare for the renovations (including the addition of a temporary library in the summer of 2021), Braddock ES relocated Ms. Jones and her furniture and resource materials from Room 2A to Room 38 in April 2021. (Def. Ex. 1 at 28, 37, and 41; Def. Ex. 3 at 57; Def. Ex. 7.)

14.     In June 2021, after the end of the 2020-21 School Year, Braddock ES staff requested that FCPS's environmental engineer, Guyron Brock ("Mr. Brock"), inspect Room 38 for mold. (Dep. of Guyron Brock, attached as Def. Ex. 8, at 39.)

15.     On June 15, 2021, Mr. Brock inspected Room 38 and found a small amount of mold on the metal framing of shelves and on the bottom of a small, trapezoid-shaped table. Mr. Brock proposed using a ten percent bleach and water solution to clean those items and remediate the mold. (Def. Ex. 8 at 62-66; Indoor Air Quality Assessments, attached as Def. Ex. 9 at D. Jones 9.)

16.     On June 21, 2021, Mr. Brock reinspected Room 38 to ensure the furniture had been cleaned properly. Upon finding that some mold remained, Mr. Brock instructed that the shelves and table be cleaned again after first removing items from the shelves. (Def. Ex. 8 at 66-68; Def. Ex. 9 at D. Jones 10.)

17.     On September 20, 2021, Mr. Brock returned to Braddock ES to reinspect Room 38. At that time, he noted that the space was free and clear of mold, but that there was significant dust build-up on surfaces in the room. (Def. Ex. 8 at 69-70; Def. Ex. 9 at D. Jones 36.)

18.     On November 30, 2021, Mr. Brock inspected Rooms 34-39 at Braddock ES. With respect to Room 38, he found no visible mold, but he observed that significant dust build-up

remained because the room unit ventilator's vents had been covered almost entirely with teaching materials. (Def. Ex. 8 at 80-81; Def. Ex. 9 at D. Jones 42-45.)

19.      On December 6, 2021, Mr. Brock reinspected Room 38 to ensure that the dust had been cleaned and vents uncovered, and he found no air quality concerns at that time. (Def. Ex. 8 at 113-114; Def. Ex. 9 at D. Jones 63.)

20.      On December 7 2021, Isaac Robertson visited Braddock ES and collected air samples in Rooms 34-39. On December 16, 2021, he emailed Mr. Brock the results of the sample analysis from Aerobiology Laboratories, which results confirmed to Mr. Brock that there was no amplification of mold in Room 38. (Def. Ex. 8 at 92-93; Def. Ex. 9 at D. Jones 83-87.)

21.      On January 12, 2022, Ms. Jackson-Muir, Mr. Brock, and other FCPS staff met with Ms. Jones about her workspace concerns. (Def. Ex. 3 at 79; Def. Ex. 8 at 94-98.) During this meeting, Ms. Jones learned of the mold that Mr. Brock had found on the metal framing of shelves and on the small, trapezoid table the prior June of 2021. (Def. Ex. 1 at 43.)

22.      To address Ms. Jones' concerns, Ms. Jackson-Muir offered her five alternative workspaces to which she could move. In response, Ms. Jones did not select any of those five options, but instead she proposed that she use a different room, Room 34, which Ms. Jackson-Muir approved. (Def. Ex. 1 at 58-61, Def. Ex. 3 at 77-79.) At Ms. Jones' request, FCPS also provided air purifiers for Rooms 34 and 38. (Def. Ex. 1 at 44.)

23.      After the January 12, 2022 meeting, Mr. Brock again inspected Room 38 and found no issues with mold and only light dust. Braddock ES custodians were instructed to clean that day and to clean monthly thereafter. Upon learning that Ms. Jones had decided to relocate to Room 34, Mr. Brock also performed an indoor air quality assessment of Room 34, finding no mold or significant dust and concluding that the air quality in her selected room of Room 34 also was satisfactory. (Def. Ex. 1 at 67-68; Def. Ex. 8 at 103-104, Def. Ex. 9 at FCPS 74.)

24.     Mr. Brock's supervisor directed Mr. Brock to conduct follow-up inspections routinely to ensure Ms. Jones' workspaces remained free of mold. Mr. Brock thus continued to conduct those inspections, finding no further mold issues in the spring of 2022. (Def. Ex. 8 at 106, 115; Indoor Air Quality Assessments, attached as Def. Ex. 10.)

**February 2022 Requests for Accommodation**

25.     Ms. Jones suffers from a disability of reactive airway disease, which disability she has explained affects her breathing. (Def. Ex. 1 at 68-69.)

26.     On January 30, 2022, Ms. Jones contacted her supervisor, Ms. Jackson-Muir, by email to request telework on the morning of an upcoming surgery for the removal of a lung mass and for the remainder of that week. (Def. Ex. 1 at 103; 1/30/22 Email, included in Def. Ex. 11.)

27.     As Ms. Jackson-Muir did not know what the surgery procedure may entail or whether Ms. Jones should work following a surgery, on January 31, 2022, Ms. Jackson-Muir requested that Ms. Jones complete ADA paperwork and submit it to FCPS's Office of Equity & Employee Relations, or Human Resources, ("HR"). (Def. Ex. 3 at 35-36; 1/31/22 Email included in Def. Ex. 11; *see also* Def. Ex. 1 at 110-111.)

28.     At 5:48 pm on February 7, 2022, the evening before Ms. Jones' scheduled surgery, Ms. Jones submitted by email paperwork to request a reasonable accommodation. In her email, she stated that she may need to take sick leave for the remainder of the week if time was required to process her request for accommodations. (Def. Ex. 1 at 110-111; 2/7/22 Email and Attached Request for Accommodation at Def. Ex. 11.)

29.     In the February 7, 2022 paperwork that Ms. Jones submitted, Ms. Jones requested provisional telework for the duration of recovery following the February 8, 2022 lung procedure, explaining that her work building is currently under construction with possible aggravating environmental factors to her breathing. Attached to her request was supporting documentation from

6

her pulmonologist, Dr. Rabih Halabi, in which he described her medical condition as "mold exposure, pulmonary nodules" and the nature of her condition as "chronic cough for 2 years, possibly due to mold exposure at work." Ms. Jones' pulmonologist opined that Ms. Jones could return to work, "full duty (without restrictions), on 2/28/2022" and although he listed no physical or cognitive restrictions on the form, he recommended that FCPS "ensure no mold exposure at work." When asked for any *alternative* ways to assist the employee, Ms. Jones' pulmonologist recommended "telework to avoid mold exposure at work." (Def. Ex. 11.)

30.    When Lori Gibson, Senior ADA Specialist, received the paperwork, it appeared to her that Ms. Jones would be out of work until February 28, 2022, and when she returned, she needed a mold-free environment or, if not, then to telework. Because Ms. Gibson could not complete an interactive process with Ms. Jones before Ms. Jones' surgery the next day, Ms. Gibson advised Ms. Jones that she could take leave if she was unable to report to work. (Def. Ex. 4 at 57, 64-65; *see also* 2/7/22 Emails, attached hereto as Def. Ex. 12.)

31.    On February 15, 2022, Ms. Jones' pulmonologist sent FCPS an amended form, in which he extended Ms. Jones' return-to-work date to March 31, 2022, but did not revise any other portion of the form. (Def. Ex. 4 at 74-75; 2/15/22 Paperwork, attached as Def. Ex. 13.)

32.    On February 17, 2022, Ms. Jones contacted Ms. Gibson by email to advise that after taking sick leave the prior week, she had returned to work, but that she was experiencing shortness of breath and light headedness, post lung surgery, so she wanted to touch base about her pending telework accommodation, in case she needs to take additional sick leave this week and next. In response, Ms. Gibson arranged to call her the next day to discuss her request for accommodation. (*See* 2/17/22 Email, attached as Def. Ex. 14; *see also* Def. Ex. 4 at 100.)

33.    On February 18, 2022, Ms. Jones and Ms. Gibson discussed Ms. Jones' request to telework rather than taking leave. Ms. Jones believed that she could perform her job duties via

telework because she had been able to do so during the Covid-19 pandemic. Ms. Gibson advised

Ms. Jones that FCPS could not accommodate 5 day-a-week telework due to the functions of her

job, and Ms. Gibson invited Ms. Jones to submit a narrower telework request if her schedule

permitted her to telework at certain times. (Def. Ex. 1 at 124-126; Def. Ex. 4 at 52-53.)

34.     During this call, Ms. Gibson also discussed with Ms. Jones that she could contact

the Office of Benefits Services for short-term disability benefits, leave, and family medical leave if

she was unable to report to work. (Def. Ex. 4 at 119-120, 134; Def. Ex. 1 at 126.)

35.     On February 18, 2022, Ms. Jones sent Ms. Gibson an email, in which she proposed

revised accommodations that she hoped would keep her safe without taking away any essential

functions of her work. (Def. Ex. 1 at 123-124; 2/18/22 Email at Def. Ex. 15.)

36.     That same morning, Ms. Gibson replied with clarifying questions shown in red text

after Ms. Jones' original requests, and Ms. Jones replied to respond to those clarifications in blue

text. (Def. Ex. 1 at 130-131; 2/18/22 Emails, included in Def. Ex. 16 at FCPS 200-201.)

37.     In addition to speaking with Ms. Jones, Ms. Gibson also contacted Ms. Jones'

principal, Ms. Jackson-Muir. First, Ms. Gibson inquired about any concerns of mold in Ms. Jones'

workspaces, and she learned from Ms. Jackson-Muir that extensive testing already had been done

and that FCPS's environmental engineer already had reported that any mold had been remediated

and follow-up testing completed. Ms. Gibson also learned that air purifiers already had been

provided for Ms. Jones' workspaces. (Def. Ex. 4 at 42-45, 95, 141-42.)

38.     After learning from Ms. Jackson-Muir that any concerns of mold already had been

remediated, Ms. Gibson also spoke directly with FCPS's environmental engineer, Mr. Brock, and

reviewed his reports (Def. Ex. 9) to ensure Ms. Jones' workplaces were free of mold. In addition,

Ms. Gibson understood another test was being performed on February 14, 2022, which she later

learned similarly reflected that Ms. Jones' workspaces were free of mold. (Def. Ex. 4 at 140-143.)

8

39.     Aside from their discussions of mold remediation, Ms. Jackson-Muir also advised Ms. Gibson as to the support that Ms. Jones provides to students and to staff, the meetings she facilitates, and whether Braddock ES could accommodate Ms. Jones' request to telework. Ms. Jackson-Muir explained that Braddock ES could accommodate telework for Ms. Jones only on Thursday mornings until spring break, explaining that, aside from the CLT meeting on Thursday mornings, which planned to meet virtually until spring break due to limited space in the building, Ms. Jones could not meet the needs of the students and teachers or perform other essential functions of her job, such as attending in-person classes, co-teaching, working directly with students, and selecting and modeling resources from the resource room that she managed at school, if she were working from home. (Def. Ex. 3 at 85-86; Def. Ex. 4 at 54, 147; Def. Ex. 2 at ¶ 5.)

40.     Upon receiving confirmation that Ms. Jones' workplace was free of mold, and after discussing with both Ms. Jones and Ms. Jackson-Muir whether Ms. Jones could perform the essential functions of her job while teleworking, Ms. Gibson sent Ms. Jones an email outlining additional accommodations that FCPS could provide and asking Ms. Jones if she would accept them as follows:

- Ability to telework Thursday morning through Spring break. Please note: intervention groups are starting within the next week and you are scheduled to begin working with students. In addition, the CLT meetings have been virtually due to renovations. These meetings are expected to continue virtually until spring break. After spring break, CLT will resume in-person in the new wing of the building; therefore, you are able to telework during CLT time until the move is made to in-person meetings.
- Additional PPE (gloves, masks, plexiglass).

    As far as the request for a 10-minute mask break per hour, due to renovations and limited space, there is no place to designate as a single office/workspace to accommodate this. I would suggest taking mask breaks when other staff or students aren't around.

(Def. Ex. 16 at FCPS 199-200; Def. Ex. 1 at 132, 135-136; Def. Ex. 4 at 92-94, 159-160.)

41.   In response to Ms. Gibson's request to let her know if she accepts the offered accommodations, Ms. Jones replied, "The answer is yes." (Def. Ex. 16; Def. Ex. 1 at 137.)

42.   After receiving Ms. Jones' acceptance, Ms. Gibson sent an email to Ms. Jones and Ms. Jackson-Muir, to notify both of them of the approved accommodations. Thereafter, Ms. Jones teleworked on Thursday mornings until spring break, and PPE was available to her, though she never asked for it as she never needed it. (Def. Ex. 1 at 147-149; *see also* Def. Ex. 17.)

**Ms. Jones Seeks to Revisit Her Accommodations**

43.   In late February 2022, Ms. Jones learned that the Commonwealth of Virginia had lifted its mandate that teachers and students wear masks in school (which mandate Ms. Jones concedes had been impossible to enforce as parents already sent students to school without masks). At that time, Ms. Jackson-Muir had advised all staff to complete ADA forms if they had health issues compromised by working with unmasked students and colleagues, and Ms. Jones reached out seeking reconsideration of the decision not to grant her full-time telework through March 31, 2022. (Def. Ex. 1 at 170; *see also* 2/28/22 Email, included in Def. Ex. 18 at FCPS 213-214.)

44.   Ms. Gibson responded on March 2, 2022, reviewing FCPS's earlier determination that full-time telework is not possible due to the essential functions of Ms. Jones' job. (Def. Ex. 1 at 170; Def. Ex. 18.)

45.   Upon receiving Ms. Gibson's March 2, 2022 email, Ms. Jones contacted Ms. Jackson-Muir to ask what additional accommodations she might approve. Ms. Jackson-Muir explained that, as she had stated to Ms. Gibson, due to Ms. Jones' work responsibilities as an Instructional Resource Teacher, she could only approve what already had been offered to Ms. Jones. That same day, Ms. Gibson advised that she intended to visit Braddock ES the next week and would be happy to meet with Ms. Jones in person to clarify matters or answer any questions she may have. Ms. Jones declined to meet with her, replying: "All matters have been clearly stated

to me; I understand them and I have no further questions at this time." (Def. Ex. 1 at 178-180; *see* Emails at Def. Ex. 19.)

46.     On April 25, 2022, Ms. Jones' pulmonologist sent by facsimile an "Updated Request for Reasonable Accommodations." This paperwork appeared similar to the February 7 and February 15 paperwork that FCPS had received from Ms. Jones' pulmonologist (Def. Ex. 11 and 13), except that Ms. Jones' pulmonologist now recommended that she not return to full duty until May 31, 2022. As to accommodations, Ms. Jones' pulmonologist continued to recommend that FCPS "ensure no mold exposure at work." Only alternatively, did he recommend "teleworking to avoid mold exposure," and he now noted "shortness of breath while wearing mask. Anxiety do [sic] to others unmasked." (Def. Ex. 4 at 115-116; *see* Request for Accommodation at Def. Ex. 20.)

47.     As Ms. Gibson previously had learned that the mold in Ms. Jones' workspace had been remediated the prior year, Ms. Gibson reached out to Ms. Jones' pulmonologist because she felt there had been a miscommunication since he continued to request that FCPS provide a mold-free environment. (Def. Ex. 4 at 113, 115-116, 137, and 139-141.)

48.     After Ms. Gibson advised Ms. Jones' pulmonologist of the remediation of mold, a different physician, Dr. Matthew Williams, wrote a letter dated May 12, 2022, in which he opined that exposure to dust also may have caused Ms. Jones' reactive airway disease/asthma. As a result, Dr. Williams advised: "My recommendation is for her to work from home until the workplace is dust and mold free *or* she is relocated to an area where no construction is taking place." (Def. Ex. 4 at 152-155; *see also* 5/12/22 Letter attached as Def. Ex. 21 (emphasis added).)

49.     Upon receiving Dr. Williams' letter, Ms. Gibson took steps to confirm whether Ms. Jones was working in an area under construction. From Ms. Jackson-Muir, she learned that Braddock ES already had relocated Ms. Jones to trailer A3 (outside of the building) in mid-April. She also learned that after spring break (in mid-April), the newly constructed wing of Braddock ES

had opened, and all classes were occurring in the new part of the building where no construction was taking place. No classes were being held in the original part of the building which now was to be renovated. Specifically, Ms. Jackson-Muir confirmed that when Ms. Jones visited classrooms or worked with students, this was done in the newly constructed building, which was not under construction. (Def. Ex. 4 at 89-91 and 155-157; *see also* Def. Ex. 22.)

50.     Upon receiving this information from Ms. Jackson-Muir, Ms. Gibson understood that FCPS already had provided Ms. Jones with Dr. William's alternative recommended accommodation that she be relocated from areas of construction, and Ms. Gibson once again sought clarification from Ms. Jones as to the accommodations she needed. (Def. Ex. 4 at 156-157; *see also* Email to Ms. Jones at Def. Ex. 23.)

**Final Accommodations Requested for Last Two Weeks of School Year**

51.     On May 31, 2022, Ms. Jones requested to refrain from substitute teaching through the end of the year. Ms. Gibson explained that FCPS could not grant this request to be excused from this duty because, as a resource teacher at a Title I school, one of her job duties was to serve as a substitute teacher for a class when needed and because, at that time, FCPS had a shortage of substitute teachers and the students need instruction. FCPS did, however, confirm that Ms. Jones would only be asked to serve as a substitute teacher in the newly constructed building as all classes had moved out of the old building which was to be renovated next. (Def. Ex. 1 at 195, Def. Ex. 4 at 89-91, 158-159.)

52.     On May 31, 2022, Ms. Jones also requested intermittent sick leave on June 3, 6, 7, and 10. The School Board granted this request. (Def. Ex. 1 at 191-192.)

53.     Indeed, the School Board granted Ms. Jones leave every time she made a request for leave in the spring of 2022.[2] (Def. Ex. 1 at 237.)

54.     On June 2, 2022, Ms. Jones made a final request that she be able to attend a certain zoom meeting from home, while on leave. FCPS also granted this request. (Def. Ex. 1 at 197-198.)

55.     Having learned in March that reassignment may be the next step if FCPS could not accommodate Ms. Jones at Braddock ES any further, Ms. Jones initiated a transfer to Graham Road Elementary School, within FCPS, for the 2022-23 school year. (Def. Ex. 1 at 54-55, 237-238.)

**<u>Argument</u>**

The ADA prohibits a covered employer from discriminating against a qualified individual with a disability, which includes "not making reasonable accommodations to the known physical or mental limitations" of such qualified individual, unless the employer can demonstrate that the accommodation would impose an undue hardship on its business. 42 U.S.C. § 12112(a), (b)(5); *see also Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 (4th Cir. 2021).

To survive summary judgment on her claim that the School Board failed to accommodate her disability in violation of the ADA, Ms. Jones first must show: "(i) she was disabled, (ii) the employer had notice of her disability; (iii) she could perform the essential functions of the position with a reasonable accommodation; and (iv) that the employer refused to make such accommodation." *Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 165 (4th Cir. 2024). For purposes of the School Board's Motion for Summary Judgment, the School Board does

---

[2] Additionally, in Ms. Jones' separate claim under Virginia's Worker's Compensation Act, an order has been entered requiring the School Board to restore Ms. Jones' sick leave for any day of leave taken in the spring of 2022 to compensate her for workplace injuries under the Act. (Def. Ex. 1 at 193.) Thus, Ms. Jones has no request for any lost wages in this case, nor can she recover in this case any amounts for which she already has been compensated, even if she could prove her claim. *See NLRB v. Moss Planning Mill Co.*, 224 F.2d 702, 703-05 (holding that where an employer makes payment of a workers' compensation claim, that payment is not collateral and must be deducted from any awards of backpay); *see also Riffey v. K-VA-T Food Stores, Inc.*, 284 F. Supp. 2d 396, 398 (W.D. Va. 2003) (same in context of a claim under the ADA).

not contest that Ms. Jones was disabled or that the School Board, as her employer, had notice of her disability after January 30, 2022. As set forth below, however, because Ms. Jones cannot satisfy the third and fourth elements of her prima facie case, the School Board is entitled to summary judgment in its favor.

## I. The School Board Provided Ms. Jones the Reasonable Accommodations Recommended by Her Pulmonologist.

The clearest ground on which Ms. Jones' claim fails in this case is on the fourth element, in which Ms. Jones must prove that the School Board failed to make a reasonable accommodation. As set forth below, because the School Board granted the accommodations recommended by Ms. Jones' pulmonologist, no reasonable jury could find on this record that the School Board denied Ms. Jones a reasonable accommodation.

"The ADA does not provide an all-inclusive definition of the term 'reasonable accommodation.'" *Tartaro-McGowan*, 91 F.4th at 166. "Instead, it provides examples of what a reasonable accommodation *may* include, like job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . and other similar accommodations." *Id.* (emphasis in original) (citing 42 U.S.C. § 12111(9)(B)). As regulatory guidance explains, "other similar accommodations" includes "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment." *Hannah v. United Parcel Serv.*, 72 F.4th 630, 636 (4th Cir. 2023) (citing 29 C.F.R. § 1630.2(o) (App'x.)). In short, "the range of reasonable accommodations is broad," and "what will serve as a reasonable accommodation in a particular situation may not have a single solution, but rather, many possible solutions." *Tartaro-McGowan*, 91 F.4th at 167.

For these reasons, the Fourth Circuit long has held "an employer is not necessarily required to 'provide the exact accommodation that the employee requested." *Id.* (quoting *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 415 (4th Cir. 2015)). "To the contrary, where 'an employee may

be accommodated through a variety of measures, the employer, exercising sound judgment, possesses the ultimate discretion over these alternatives.'" *Id.* (quoting *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020)). "And so long as the employer's chosen accommodation is reasonable, even if not perfect, [the Court's] inquiry is at an end—"not even a well-intentioned court may substitute its own judgment for the employer's choice." *Id.*

### A. Consistent with Ms. Jones' Pulmonologist's Recommendations, the School Board Offered Ms. Jones Sick Leave and Ensured Her Workspaces Were Free of Mold.

In this case, before Ms. Jones requested any reasonable accommodation of a disability, the School Board began accommodating her concerns about her workplace environment by (i) conducting regular indoor air quality testing to ensure Ms. Jones' workplaces were free of mold, (ii) granting her request to relocate from Room 38, and (iii) granting her request for air purifiers to be installed in Room 38 and her selected, alternative room of Room 34. (SUMF 17-24.)

Against this backdrop, the School Board received Ms. Jones' request for accommodation of a disability on February 7, 2022, in the late afternoon before her scheduled lung procedure the following day. (SUMF 28) In her request, Ms. Jones sought "provisional telework under regulation 4417 for the duration of her recovery following this lung procedure," and she included in her request supporting documentation from her pulmonologist. (SUMF 28-29; *see also* Ex. 11.) In the pulmonologist's supporting documentation, Ms. Jones' pulmonologist described Ms. Jones' medical condition as "mold exposure, pulmonary nodules," indicating that she had suffered from a chronic cough for two years, "possibly due to mold exposure at work." *Id.* Ms. Jones' pulmonologist indicated that Ms. Jones could return to work, full duty (without restrictions), on February 28, 2022, which time period her pulmonologist extended to March 31, 2022, the following week. (SUMF 31; *see also* Ex. 13.) And though Ms. Jones' pulmonologist did not indicate that Ms. Jones had any other limitations, he nonetheless recommended that the School

15

Board "ensure no mold exposure at work." (SUMF 29, 31; Exhibits 11, 13.) Only as an "alternative way to assist the employee" did Ms. Jones' pulmonologist recommend that Ms. Jones be permitted to telework, and he did so for the express purpose of "avoid[ing] mold exposure at work." *Id.*

Because HR could not engage in the interactive process fully before Ms. Jones' scheduled lung procedure the next day, HR sent Ms. Jones an email granting her leave if she was unable to report to work. (SUMF 30) Notwithstanding that Ms. Jones' pulmonologist recommended that she not return to work until March 31, 2022, Ms. Gibson became aware on February 17, 2022, that Ms. Jones already had elected to return to work earlier. (SUMF 32.) That same day, Ms. Gibson corresponded with Ms. Jones to schedule a call to discuss her request for accommodation. *Id.* During the call on February 18, 2022, Ms. Gibson advised Ms. Jones that full-time telework likely would not be possible due to the essential functions of her job, and she advised Ms. Jones to contact the Office of Benefit Services for a leave of absence if she could not return to work. (SUMF 34.) Ms. Jones has testified that the School Board never denied her any leave she requested during the spring of 2022. (SUMF 53.)

In addition to ensuring that Ms. Jones could utilize her sick leave or take a leave of absence if she could not physically report to work, Ms. Gibson also inquired internally as to Ms. Jones' concerns of mold, given her pulmonologist's primary recommendation to ensure a mold-free environment. (SUMF 37-38.) During this process, Ms. Gibson became aware that the only mold ever found in Ms. Jones' workspaces at Braddock ES included the small amount of mold found on metal framing of shelves and under one small table in Room 38 the prior June of 2021, which mold had been remediated the prior year and from which room Ms. Jones already had been permitted to relocate. (SUMF 17-22, 24, 37.) Ms. Gibson also received the Indoor Air Quality reports from Mr. Brock reflecting that the two rooms utilized by Ms. Jones—Rooms 34 and 38—had tested free of mold in November and December 2021 as well as in January of 2022. (SUMF 38; Def. Ex. 9.) Ms.

16

Gibson then received and reviewed an Indoor Air Quality report dated February 14, 2022, again reflecting no mold concerns in Room 38. (SUMF 38.) Finally, Ms. Gibson learned that a January 2022 meeting with Ms. Jones had resulted in FCPS allowing Ms. Jones to relocate to an alternative workspace, providing air purifiers for both of her workspaces, and tasking Mr. Brock with performing indoor air quality inspections of her workspaces on a regular basis. (SUMF 37-38.)

As the undisputed evidence in this case demonstrates, the School Board granted the primary accommodation recommended by Ms. Jones' pulmonologist by taking adequate steps to ensure that Ms. Jones' workspaces were free of mold through remediation the prior year, indoor air quality testing on a regular basis to ensure conditions were not conducive to mold, by allowing her to relocate her workspace, and through the provision of air purifiers. (SUMF 17-24, 37-38.) As Ms. Jones' own pulmonologist's primary recommendation in February 2022 was a workspace free of mold, which he explained would improve her condition (SUMF 29, 31; *see also* Exs. 11, 13), Ms. Jones can hardly argue now that her pulmonologist's recommended accommodation was not reasonable. And so long as the School Board's accommodation was reasonable, "even if not perfect," the court's inquiry ends. *Tartaro-McGowan*, 91 F.4th at 167.

In addition to ensuring her workspaces were free of mold as recommended by her pulmonologist, the School Board also accommodated Ms. Jones by allowing her to utilize her sick leave or to apply for an unpaid leave of absence if Ms. Jones still did not feel she could report to work safely. (SUMF 28, 30, 34, and 53.) Where, as here, a leave of absence is indicated by an employee's pulmonologist to be temporary to allow an employee to safely return to full duties, the Court of Appeals for the Fourth Circuit has held that such leave is a reasonable accommodation and suffices to satisfy the School Board's obligations under the ADA. *See Hannah*, 72 F.4th at 636. For example, in *Hannah*, the Fourth Circuit affirmed a district court's grant of summary judgment to an employer that had accommodated its employee with unpaid leave of absence to allow him

time to recover and return to fully duty, even though the employee had not wanted to take time off without pay and believed the employer could accommodate him on the job with different equipment. *Id.*

That Ms. Jones, like the employee in *Hannah*, did not wish to take a leave of absence does not render the accommodation any less effective.[3] Indeed, while "an individual with a disability is not required to accept an accommodation," if such individual rejects a reasonable accommodation and cannot, as a result of that rejection, perform the essential functions of the job, "the individual will not be considered qualified." 29 C.F.R. § 1630.9(d). Put differently, in light of the undisputed facts that the School Board ensured Ms. Jones' workspaces were free of mold per her pulmonologist's primary recommendation and never denied Ms. Jones any leave that she or her pulmonologist requested, Ms. Jones lacks evidence sufficient for a reasonable jury to conclude that the School Board failed to reasonably accommodate her disability.

### B. Consistent with Ms. Jones' Pulmonologist's Subsequent Recommendation, the School Board Ensured Ms. Jones Worked Only in Areas Not Under Construction.

On April 25, 2022, HR received a third set of accommodation paperwork from Ms. Jones' pulmonologist. (SUMF 46.) Although Ms. Jones voluntarily had returned to work in mid-February, the paperwork now extended her return-to-work date to May 31, 2022. (SUMF 46; Def. Ex. 20.) Likewise, Ms. Jones' pulmonologist's primary recommendation remained "ensure no mold exposure at work." (*Id.*) Only alternatively, did he suggest telework "to avoid mold exposure at work." *Id.* Believing there may be a miscommunication as to the status of any mold issues in Ms. Jones' workspaces, Ms. Gibson contacted Ms. Jones' pulmonologist to advise that any mold previously found in Ms. Jones' workspaces had been remediated in 2021, enclosing such reports,

---

[3] The School Board, unlike the employer in *Hannah*, had no reason to force Ms. Jones to take a leave of absence against her wishes because the School Board also took steps to ensure that her workplace was free of mold, as primarily recommended by her pulmonologist.

and asking for clarification if recommended accommodations remained due to mold. (SUMF 47.)

In response, on or about May 16, 2022, HR received a letter from Ms. Jones' pulmonologist, dated

May 12, 2022, explaining that initially it was thought that mold exposure alone may have caused

Ms. Jones' issues, but, in light of the mold abatement, "significant dust exposure" also could be a

cause. (SUMF 48; Def. Ex. 21.) Ms. Jones' pulmonologist then made a new recommendation:

"work from home until the workplace is dust and mold free **or** she is relocated to an area where no

construction is taking place." (*Id.* (emphasis added).)

That same day, Ms. Gibson contacted Ms. Jones' principal, Ms. Jackson-Muir, and learned

that as of spring break (early April 2022), FCPS already had relocated Ms. Jones outside of the

building under construction to trailer A3, and that all classrooms had been relocated to the newly

constructed building, so that when Ms. Jones visits classrooms or works with students, she does so

in the new building, which is an area free from construction. (SUMF 49.) Accordingly, once again,

by the time HR received a recommendation for an accommodation from Ms. Jones' pulmonologist

—in this case to relocate Ms. Jones to an area not under construction—Ms. Gibson learned that the

School Board already had done so.

Upon confirming Ms. Jones' relocation to an area of the Braddock ES building that was not

under construction, Ms. Gibson asked Ms. Jones to specify if she required additional

accommodations. (SUMF 50.) Shortly thereafter, Ms. Jones requested (i) intermittent leave in early

June, (ii) to refrain from substitute teaching in any class, and (iii) to attend from home virtually one

meeting on June 3, a day on which she requested leave. (SUFM 51-52, 54.) In response, the School

Board granted the first and third requests—again permitting Ms. Jones to take leave on any day she

requested—but explained that if she were not on leave, it could not excuse her from substitute

teaching because an essential function of her job as a resource teacher includes serving as a

substitute teacher, and she could not be excused from this duty due to short staffing. (SUMF 51.) In

the alternative, however, the School Board confirmed that Ms. Jones would only serve as a substitute teacher for classrooms in the new building, which were free from construction as recommended by her pulmonologist. (SUMF 51.)

In sum, the School Board's accommodation of ensuring that Ms. Jones not work in an area under construction (by granting her leave and by allowing her to work in trailer A3 or only in classrooms in the newly constructed building) was one of the accommodations recommended by Ms. Jones' pulmonologist in May 2022. As the School Board selected one of the accommodations recommended by Ms. Jones' pulmonologist, Ms. Jones again lacks evidence to prove that the chosen accommodation was not a reasonable accommodation, even if it was not the exact accommodation (i.e., telework) that she preferred. Likewise, "not even a well-intentioned court may substitute its own judgment for [the School Board's] choice." *Tartaro-McGowan*, 91 F.4th at 167. For these reasons, Ms. Jones cannot prove that the School Board denied her a reasonable accommodation as would be necessary to satisfy the fourth element of her prima facie case.

II.   **Ms. Jones' Request to Telework Full-Time Was Not a Reasonable Accommodation As It Would Not Enable Her to Perform the Essential Functions of Her Position.**

In addition to her inability to satisfy the fourth element of her prima facie case, Ms. Jones also cannot satisfy the third element of her claim, which requires her to prove that she could perform the essential functions of her job with a reasonable accommodation, because her sole request to work exclusively from home five days a week would not have permitted her to perform the essential functions of her job.

A.   **Ms. Jones Could Not Perform the Essential Functions of Her Job Via Telework, Five Days a Week.**

As the Fourth Circuit has held, "An accommodation is not reasonable if it does not enable the employee to perform the essential functions of the job." *Hannah*, No. 21-1647, 2023 WL 4410526, at *3. Under the ADA, essential functions are those "that bear more than a marginal

20

relationship to the job at issue." *Cook v. United Parcel Sery., Inc.*, 2022 WL 1090251, at *3 (4th

Cir. Apr. 12, 2022). A job function may be considered essential for several reasons, including, but

not limited to, "the reason the position exists is to perform that function," or "because of the

limited number of employees available among whom the performance of that job function can be

distributed." 29 C.F.R. § 1630.2(n)(2)(i), (ii).

It is the employee's burden to show that her requested accommodation would allow her to

perform the essential functions of the position. *Hannah*, No. 21-1647, 2023 WL 4410526, at *3.

"[T]o satisfy that burden, [an employee] is not free simply to redefine the job." *Id*. Rather, the

"ADA directs that consideration be given 'to *the employer's judgment* as to what functions of a job

are essential.'" *Id*. (quoting 42 U.S.C. § 12111(8)) (emphasis in original). The ADA's regulatory

guidance further explains that:

> . . . the inquiry into essential functions is not intended to second guess an
> employer's business judgment with regard to production standards, whether
> qualitative or quantitative, nor to require employers to lower such standards . . . If
> an employer requires its typists to be able to accurately type 75 words per minute,
> it will not be called upon to explain why an inaccurate work product, or a typing
> speed of 65 words per minute, would not be adequate. Similarly, if a hotel requires
> its service workers to thoroughly clean 16 rooms per day, it will not have to
> explain why it requires thorough cleaning, or why it chose a 16 room rather than a
> 10 room requirement.

29 C.F.R. pt. 1630, app. § 1630.2(n).

Other factors relevant to whether a particular function is essential include "[t]he amount of

time spent on the job performing the function," "[t]he consequences of not requiring the incumbent

to perform the function," and "[t]he current work experience of incumbents in similar jobs." 29

C.F.R. § 1630.2(n)(3) (iii), (iv), (vii). An employer is not required to change the essential functions

of the position to accommodate an employer nor provide an accommodation that would necessitate

other employees to work harder. *Lewis v. Gibson*, 621 Fed. Appx. 163, 164-65 (4th Cir. 2015).

Based on the undisputed material facts presented, Ms. Jones cannot meet her burden of proving

that the position of a Resource Teacher at an elementary school could be performed via telework while all other students and staff physically were present in the school building.

As of February 7, 2022, when Ms. Jones submitted her request for accommodation with her pulmonologist' supporting recommendations, Ms. Jones sought to telework full-time from February 8, 2022 through February 28, 2022, which then extended to March 31, 2022, and ultimately through May 31, 2022. (SUMF 29, 31-32, 43, 45-46.) In response to Ms. Jones' requests for telework, the School Board explained that telework is not possible due to the essential functions of her job, which included providing academic interventions to students (such as by testing or working directly with students one-on-one as needed and through Braddock ES's practice of utilizing Resource Teachers as substitute teachers in classrooms); working collaboratively with teachers; meeting weekly with teachers and administration regarding curriculum and to model to teachers how to use scaffolds and materials; and analyzing data and developing curriculum. (SUMF 3-5; 33, 39, 44.) Ms. Jones disagreed, claiming that she had been able to perform these job duties from home during the Covid-19 pandemic. (SUMF 33.)

A court in this district recently rejected Ms. Jones' position, granting summary judgment in favor of the School Board of the City of Norfolk in a similar case. *Jordan v. Sch. Bd. of the City of Norfolk*, No. 2:22-CV-167, 2023 WL 5807844, at *8–11 (E.D. Va. Sept. 7, 2023). In *Jordan*, the plaintiff, an elementary school principal, requested to work remotely for the spring semester after the school returned to classroom instruction. *Id*. at *9. The school board denied her request because the essential functions of an elementary school principal require her to perform her functions in the assigned school building. *Id*. Jordan disagreed, contending that while her typical day before the pandemic included walking through the school building, greeting students and staff, and observing lessons in the classroom, she was able to perform her job functions remotely during the Covid-19 pandemic and expressed she could continue to do so. *Id*. at *9-10. The court was "not persuaded by

22

Jordan's argument that since she performed remotely during the COVID-19 pandemic, she can work remotely again and accomplish all essential functions of her position." *Id*. at *11.

As the court explained, while during the pandemic "employers permitted telework and frequently excused performance of one or more essential functions . . . these temporary pandemic-related modifications 'of certain essential functions does not [ ] mean that the essential functions have somehow changed.'" *Id*. (citing *Maffett v. City of Columbia*, 2021 WL 4596659, at *19 (D.S.C. Apr. 19, 2021), report and recommendation adopted, 2021 WL 4237189 (D.S.C. Sept. 17, 2021). Once the school board required students and employees to return in-person instruction, plaintiff was required to resume her position's essential functions as they were before the pandemic, including the requirement of physical presence at the school building. *Id*.

Just as in *Jordan*, in this case, Ms. Jones herself has acknowledged that before the Covid-19 pandemic, her entire job was in-person, on-site. (SUMF 6.) By way of example, Ms. Jones explained she had to be in the school building to meet one-on-one with students as needed either in classrooms or in a nook in the hallway in 2019. (SUMF 3; *see also* Def. Ex. 1 at 35.) While she may have met with students virtually during the Covid-19 pandemic when students also attended school virtually and instructional standards were lightened, once FCPS brought staff and students back full-time, each employee's job duties prior to the Covid-19 pandemic again were in effect. (SUMF 7-9.) And, as noted above, any argument that Ms. Jones' job duties remained permanently reduced after the Covid-19 pandemic has been flatly rejected in this district. *See Jordan* at *11. Furthermore, as students and staff returned to school post-pandemic and returned to the regular, more rigorous instructional standards, hands-on guidance and support was more critical than ever, particularly in a Title I setting. (SUMF 2, 8-10.)

Aside from meeting with students in-person, Ms. Jones also testified that she spent much of her day in a resource room in which she managed, ordered, separated, inventoried, and made ready

materials for use by teachers in their classrooms so that she could procure resource materials for them as they were needed. (SUMF 4.) When supplies were delivered, she would unpack and inventory them, which she could not do from home. Likewise, when a teacher needed materials, she would pull materials off shelves and lay them out for teachers to grab and use in classrooms, which she also could not do from home. *Id.* After procuring materials for teachers, Ms. Jones would meet with some teachers in person, including after the pandemic, in 2022. *Id.* Finally, Ms. Jones conceded that, in 2022, Braddock ES's practice was to utilize Resource Teachers like herself as substitute teachers for students in classrooms. (SUMF 3, 51.)

The job duties that Ms. Jones acknowledged she must be onsite to perform demonstrate that her presence on-site was essential to her position as a Resource Teacher. *See Crews-Sanchez v. Frito-Lay, Inc.*, No. 22-1831, 2024 WL 469306, at *1 (4th Cir. Feb. 7, 2024) (upholding district court's dismissal of failure to accommodate claim where plaintiff's "own testimony established that, at the time of her request for remote work, her essential job duties required her presence onsite"); *see also Tyndall v. National Educ. Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994) ("[e]xcept in the unusual case where an employee can effectively perform all work-related duties at home, an employee 'who does not come to work cannot perform any of his job functions, essential or otherwise' "); *Jordan*, No. 2:22-CV-167, 2023 WL 5807844, at *8–11 (no dispute of material fact regarding the essential nature of a school principal's physical presence after the return to in-person learning); *Davis v. Wilkie*, 2020 WL 7647455 at *5 (D.S.C. Oct. 8, 2020) (summary judgment for employer appropriate on claim regarding denial of telework where the unrefuted evidence showed that plaintiff's job could not be performed outside of the clinic). It is unreasonable for a Resource Teacher, particularly one teaching students as young as kindergartners to second graders, to telework when those students are in the building. As Ms. Jones herself acknowledges, "it's obviously better to be there." (SUMF 10.)

**B. Although the School Board Had Granted the Reasonable Accommodations Recommended by Ms. Jones' Pulmonologist, It Also Granted Her the Limited Telework It Could Grant Without Eliminating Essential Functions.**

Although the undisputed material facts support that Ms. Jones could not perform the essential functions of her job via full-time telework, both Ms. Gibson and Ms. Jackson-Muir nonetheless continued the interactive process with Ms. Jones to find time during her workweek in which Braddock ES could accommodate more limited telework. (SUMF 33.) In that process, Ms. Jones identified Thursdays as a day of the week on which she believed she could perform all of her duties via telework. (SUMF 35; Def. Ex. 15.) Ms. Gibson discussed Ms. Jones' request with Ms. Jackson-Muir, who determined that Ms. Jones could not perform all of her essential functions from home, but that she could telework on Thursday mornings until spring break (the first week of April) because the meeting that Ms. Jones facilitated on Thursday mornings planned to meet virtually due to the renovations until it could meet in the newly constructed portion of the renovated building after spring break. (SUMF 39.) Consequently, Braddock ES offered Ms. Jones the ability to telework on Thursday mornings until spring break, which offer Ms. Jones accepted. (SUMF 40-42.)

Based on the undisputed material facts presented, including the parties' agreement during the interactive process that telework was feasible only one morning a week, Ms. Jones cannot meet her burden of proving that full-time telework was a reasonable accommodation. For these reasons, Ms. Jones cannot satisfy the third element of her prima facie case, and the School Board is entitled to summary judgment in its favor.

<u>**Conclusion**</u>

For the foregoing reasons, Defendant Fairfax County School Board, by counsel, respectfully requests that this Honorable Court grant its Motion for Summary Judgment, enter judgment in its favor, and award it such further relief as this Court deems appropriate.

Respectfully submitted,

FAIRFAX COUNTY SCHOOL BOARD
By Counsel

Date: March 1, 2024

BLANKINGSHIP & KEITH, P. C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
(703) 691-1235 (telephone)
(703) 691-3913 (facsimile)

By:      /s/ Laurie L. Kirkland
         Laurie L. Kirkland, VSB No. 75320
         lkirkland@bklawva.com
         Dana Leinbach, VSB No. 95866
         dleinbach@bklawva.com
         *Counsel for Defendant Fairfax County*
         *School Board*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of March 2024, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

Seth James B. Obed, Esquire
Robert M. Bohn, Esquire
OBED LAW, PLLC
429 North Saint Asaph St.
Alexandria, VA 22314
*Counsel for Plaintiff*

       /s/ Laurie L. Kirkland
Laurie L. Kirkland, Esq.
Virginia State Bar No. 75320
BLANKINGSHIP & KEITH, P.C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
Phone: 703-691-1235
Fax: 703-691-3913
lkirkland@bklawva.com
*Counsel for Defendant Fairfax County*
*School Board*

26