**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

DONNA JONES,

                Plaintiff,

v.

                Civil Action No.: 1:23-cv-359-AJT-LRV

FAIRFAX COUNTY SCHOOL BOARD,

                Defendant,

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEEFNDANT FAIRFAX
<u>COUNTY SCHOOL BOARD'S MOTION FOR SUMMARY JUDGMENT</u>**

DONNA JONES, *Plaintiff*
By Counsel:

OBED LAW, PLLC
Seth James B. Obed, VSB #82482
Robert M. Bohn, VSB #96888
429 N Saint Asaph St.
Alexandria, VA 22314
[t](703) 567-4052;
[f](703) 894-4940
sobed@obedlaw.com
***Counsel for Plaintiff***

## TABLE OF CONTENTS

COVER PAGE…………………………………………………………………………….

TABLE OF CONTENTS………………………………………………………………..i

TABLE OF AUTHORITIES…………………………………………………………..i

EXHIBIT LIST…………………………………………………………………...iii

 Introduction……………………………………………………………...…….1

 FCPS's Statement of Undisputed Material Facts………………………………..2

 Plaintiff's Statement of Additional Relevant Facts…………………………..12

 Standard of Review………………………………………………………..13

 Argument…………………………………………..…………………....14

 Conclusion……………………………………………………………...26

## TABLE OF AUTHORITIES

**CASES**                **Page Nos.**

*Allen v. City of Raleigh*, 140 F.Supp. 3d 470, 482-83 (E.D.N.C. 2015)………………………....15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)…………………………………13, 14

*Celotex v. Catrett*, 477 U.S. 317, 322 (1986)………………………………………………………13

*Chalmers v. Intel Corp.*, 2014 U.S. Dist. LEXIS 12995, (D. Ariz., Oct. 1, 2012)………………19

*Crews-Sanchez v. Frito-Lay, Inc.*, 2022 U.S. Dist. LEXIS 125901 *2
 (W.D. Va. July 15, 2022)…………………………………………………………………….22

*Crews-Sanchez v. Frito-Lay, Inc.*, (4th Cir. Feb 7, 2024)…………………………………….22

*Davis v. Wilkie*, 2020 U.S. Dist. LEXIS 238301 *(D.S.C. Oct. 8, 2020)……………….........22, 23

*Denese G. v. Dep't of the Treasury*, EEOC Appeal No. 0120141118 (Dec. 29, 2016)………….19

*Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004 (4th Cir. 2020)……………………………25

*Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, (1st Cir. 2000)………………………20

*Graves v. Finch Pruyn & Co.*, 457 F.3d 18 (2nd Cir. 2006)………………………………...20, 22

*Haneke v. Mid-Atlantic Capital Mgmt.*, 131 App'x 399, 400 (4th Cir. 2005)…………………...15

*Hannah v. United Parcel Serv.*, 72 F.4th 630, 636 (4th Cir. 2023)……………………..……20, 22

*Jordan v. Sch. Bd. Of the city of Norfolk*, Case No. 2:22-cv-167,
2023 WL 5807844, at *8-11 (E.D. Va. Sept. 7, 2023)………………………………………...…24

*Kranson v. Fed. Express Corp.*, 2013 U.S. Dist. LEXIS 154473, 2013 WL 5807795 (N.D. Cal.
Oct. 28, 2013)……………………………………………………………………………………19

*Lewis v. Gibson*, 621 Fed. Appx. 163 * (2015)……………………………………………….23

*Mamola v. Group Mfg. Servs., Inc.*, 2010 WL 1433491 (D. Ariz. Apr. 9, 2010)……………..…19

*Merrill v. McCarthy*, 184 F. Supp. 3d 221, 238 (E.D.N.C. 2016)………………………………14

*Price v. Norfolk S. Corp.*, 2022 U.S. Dist. LEXIS 175238 (E.D. Va., July 21, 2022)…...14, 15, 19

*Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407 (4th Cir. 2015)…………………………..…19

*Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158 (4th Cir. 2024)……….14, 17, 20 21

*Thersa v. Louis DeJoy, United States Postal Service*, Appeal No. 0120182764;
Hearing No. 440-2018-00103X; Agency No. 4J-530-0028-17 (June 23, 2021)……………..…19

*Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994)……………….…22

*U.S. Airways v. Barnett*, 535 U.S. 391, 400 (2002)…………………………………………14

*Wilson v. Dollar General Corp.*, 717 F.3d 337 (4th Cir. 2013)…………………………………15

*Woodson v. Int'l Bus. Machines, Inc.*, 2007 WL 4170560 (N.D. Cal. Nov. 19, 2007)………..…19

## STATUTES

29 C.F.R. §1630, appendix…………………………………………………15, 16, 20, 23, 24

29 C.F.R. §1630.1(c)(4)……………………………………………………………..…14

29 C.F.R. §1630.2(n)(2)……………………………………………………………………25

29 C.F.R. §1630.2(n)(3)(i)-(vii)…………………………………………………………25

29 C.F.R. §1630.2(o)(Appendix)(2011)………………………………………………...…1

29 C.F.R. §1630.2(o)(1)(ii))…………………………………………………………...…14

29 C.F.R. §1630.2(o)(2)(i)-(ii)…………………………………………………………...20

29 C.F.R. §1630.2(o)(2)(ii)…………………………………………………………………23

29 C.F.R. §1630.4(ii)………………………………………………………………….....24

29 C.F.R. §1630.4(iv)……………………………………………………………………24

29 C.F.R. §1630.4(v)………………………………………………………….…24

29 C.F.R. §1630.5……………………………………………………………..…24

29 C.F.R. §1630.9(b)……………………………………………………………24

29 C.F.R. §1630.9(d)……………………………………………………………16

29 C.F.R. §1630.12……………………………………………………….……..24

29 C.F.R. §6130 app. § 1630.9……………………………………………….…..14

**RULES**

Fed. R. Civ. P. 56(c)……………………………………….………………….…..13

**EXHIBIT LIST**

| Number | Document Title | Description/Sub-Exhibit Titles |
|---|---|---|
| PTX001 | | **001-** FCPS 328 Blueprint<br>**002-005-** BES Site Plan<br>**006-** Construction Phases |
| PTX002 | Declaration D. Jones 2.2.24 | **003-005-** Exhibit A<br>**006-017-** Exhibit B |
| PTX003 | 10.5.23 vwc-VA02000037876-Stipulated Order 653 to 656 | Workers Comp Order |
| PTX004 | Medical Documents | **001-**Conditions<br>**002-007-** Dr. Halabi NVPCCA Visit<br>**008-** Spirometry Airway Obstruction<br>**009-** Spirometry Result<br>**010-011-** Culture Results C. Hennigh NP Mycobacterium<br>**012-019-** MycoTox Profile Dr. Tranchitella |
| PTX005 | Requests for Accommodation | **001-002-** 22.01.30 EM Accommodation Request_Redacted<br>**003-** 22.01.31 EM LG to SM re DJ Insisting Injury related to Mold<br>**004-** 22.02.01 EM LG to DJ Denying Telework as an Accommodation<br>**005-008-** 22.02.02 EM AZ and LG Conflicting Statements re Accommodation and Confusion on Telework<br>**009-** 22.02.02 EM DJ to LG.AZ Free from Construction and Work Not Leave_Redacted<br>**010-013-** 22.02.02 EM Not about Taking Leave but Accommodating Work_Redacted<br>**014-021-** 22.02.07 EM Accommodation Request Follow up. ADA Request_Redacted<br>**022-** 22.02.07 EM AZ to LG Absurd to Ensure No Mold |

| | | |
|---|---|---|
| | Requests for Accommodation (cont.) | **023-024**- 22.02.07 EM DJ re Environmental Allergen Tests.Surgery<br>**025**- 22.02.07 EM DJ to LG and AZ Breathing Issues<br>**026-032**- 22.02.15 FCPS ADA Form 2nd Request Dr. Return_Redacted<br>**033**- 22.02.17 EM DJ to LG Additional Exacerbated Symptoms<br>**034-039**- 22.02.17 EM L. Gibson FCPS ADA Correspondence<br>**040-044**- 22.02.17 EM Shortness of Breath. Telework not Possible due to Essential Functions of Job<br>**045-046**- 22.02.17 L. Gibson Internal Notes<br>**047**- 22.02.18 Consider Essential Functions and if Can or Cannot be accommodated_Redacted<br>**048**- 22.02.18 EM DJ Short Bullet List of Accom.<br>**049-051**- 22.02.19 Post Call EM<br>**052**- 22.02.22 EM LG to DJ KJM COVID May Change Accommodations. Contact EER to Revisit<br>**053-054**- 22.03.01 LG and CC Contemplate DJ Request to Work Safely<br>**055-058**- 22.03.02 EM C. Carroll to L. Gibson re VM and questioning D. Jones requests<br>**059**- 22.02.17 VM DJ to EER Office Transcript of Attachment<br>**060-062**- 22.03.02 Resign Separate from Employment<br>**063-064**- 22.03.03 EM re CF LG Avoid Fingerpointing Treat as WC<br>**065-068**- 22.03.04 EM Chain LG KJM DJ HD TC CC re Contact EER to Revisit<br>**069**- 22.03.16 0848am LGibson EM to MKim re Accom. _Redacted<br>**070-072**- 22.03.16 LGibson.MKim Correspondence re Classroom Space.Conditions_Redacted<br>**073**- 22.03.17 502pm LGibson to MKim.KJM re Resign or Separate from Empl. Accom._Redacted<br>**074-078**- 22.04.25 .22. 19 Worsening Symptoms<br>**079-083**- 22.04.25 FCPS ADA Form 3rd Dr. Request Redacted<br>**084-086**- 22.04.27 05.16 EMs Response from EER and 3rd ADA Request<br>**087**- 22.04.27 EM DJ to LG CC KJM re 3rd Accommodation Request 5.3 Lung Surgery<br>**088-091**- 22.05.05 EM L. Gibson Misquoting Accommodation Request to WC Claims Examiner<br>**092-094**- 22.05.05 EM L. Gibson Questioning Surgery Asking Dr to Withdraw Request<br>**095-096**- 22.05.12 Ltr Dr. Williams ADA Request Redacted<br>**097-117**- 22.05.17 ADA EM. Attachment Claims Ltr.Attch Photos<br>**118**- 22.05.17 EM KJM to LG re New Building Distinction |

| | | |
|---|---|---|
| | | **119-** 22.05.17 EM LG to DJ Free from Construction<br>**120-** 22.05.19 FCPS Response J. Judkins<br>**121-130-** 22.05.20 Jones.OLG Response and Timeline<br>**131-134-** 22.05.25 Jones.OLG EM Correspondence<br>**135-** 22.05.26 EM FCPS Response EK<br>**136-140-** 22.05.27 EM COVID Response<br>**141-142-** 22.05.27 EM Zoom on Sick Leave<br>**143-145-** 22.05.31 EM Response to L. Gibson re Coercion<br>**146-147-** 22.06.02 EM Accommodation Request Last Effort<br>**148-151-** 22.06.09 Ltr D. Jones to FCSB |
| PTX006 | Telework Provision | Regulation 4417.1 Telework Provisions for FCPS Employees |
| PTX007 | 21.09.27 ADA Template FCPS | Responses to ADA Requests/Approval/Cannot Accommodate |
| PTX008 | Full IAQs<br><br><br>Full IAQs (cont.) | **001-002-** 19.07.25 IAQ BES Rooms<br>**003-** 21.06.15 IAQ Room 38<br>**004-** 21.06.21 IAQ Room 38<br>**005-** 21.09.20 IAQ Room 38<br>**006-010-** 21.11.30 IAQ Rooms 34-39<br>**011-** 21.12.06 IAQ Rooms 36-38<br>**012-016-** 21.12.07 IAQ Room 38<br>**017-** 22.01.20 IAQ Room 34<br>**018-019-** 22.02.14 IAQ BES<br>**020-** 22.03.15 IAQ Room 38<br>**021-022-** 22.04.08 IAQ Room 38 |
| PTX009 | EMs re Workplace Conditions | **001-002-** 19.07.25 EM re Mold at BES<br>**003-006-** 21.05.16 Asbestos Fibre Sampling<br>**007-009-** 21.06.16 Asbestos Abatement in 38 and Nearby<br>**010-011-** 21.08.17 EM Puddling Mud Issue<br>**012-016-** 21.08.31 EM Not accessible Mold discovered in Rm 38<br>**017-019-** 21.09.17 EM Rain and Flooding in Gym<br>**020-028-** 21.09.17 KJM EM Issues at BES<br>**029-030-** 21.11.30 EM Tar on Roof<br>**031-034-** 21.12.01 EM re Air Sampling Only After Cleaning<br>**035-039-** 21.12.03 EM Construction and Construction Smells<br>**040-054-** 21.12.07 BES Issues in Room 38<br>**055-056-** 21.12.16 EM Room 38 Construction Area<br>**057-061-** 21.12.16 Robertson Report and Mold Spore Counts<br>**062-064-** 22.01.12 EM Informal Inspection<br>**065-067-** 22.01.12 Environmental Team Meeting Minutes<br>**068-071-** 22.01.12 BES Meeting Minutes MK.DJ<br>**072-074-** 22.01.20 EM Humidity and Heat No 38 Inspection<br>**075-** 22.01.28 Scent from Roofing Renovation<br>**076-079-** 22.01.30 Report to Work S. Brabrand_Redacted<br>**080-082-** 22.02.01 EM Chemical Smell |

| | | **083-084-** 22.02.01 EM Roofing Odors Temporary Wall |
|---|---|---|
| PTX010 | Room 38 Maintenance Report | |
| PTX011 | Discovery Responses | |
| PTX012 | Transcripts | A- 22.08.26 D Jones VWCC Deposition<br>B- 23.01.24 VWCC Hearing<br>C- 24.01.29 D Jones Deposition<br>D- 24.02.05 G Brock Deposition<br>E- 24.02.06 L Gibson Deposition<br>F- 24.02.06 K Jackson-Muir Deposition |
| PTX013 | Dr. Halabi Declaration | |
| PTX014 | Work Summaries | |
| PTX015 | Donna Jones Declaration | |
| PTX016 | FCPS Title 1 Grant Overview | |
| PTX017 | Monica Kim Declaration | |

**Introduction**

Defendant Fairfax County School Board ("FCPS") argues that FCPS provided reasonable accommodations to Plaintiff by: 1) Ensuring workspaces to be "free of mold"; 2) Granting "leaves of absences"; and 3) "[R]elocat[ing] [Plaintiff] to an area of the school building not under construction". Dkt. No. 50. FCPS has not demonstrated that Plaintiff's workspaces were free of mold. FCPS never offered a workspace "free of mold" as an accommodation. FCPS did not offer leave to Plaintiff in the context of an accommodation. Nor was leave an effective accommodation for Plaintiff. Plaintiff was never relocated to a workspace free of construction. Nor did FCPS relocate Plaintiff as part of any "accommodation". "Reasonable accommodation", in relevant part, is defined as:

> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or
>
> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. §1630.2(o) (Appendix) (2011).

FCPS's purported accommodations did not provide any modification or adjustment for Plaintiff, whether to Plaintiff's workplace environment, job duties, schedule, or otherwise. While FCPS steadfastly maintained throughout 2022 that it provided Plaintiff two accommodations (telework for a Thursday morning meeting on a handful of occasions and free "PPE"), in its brief for summary judgment, FCPS all but abandons those "accommodations" and instead offers a range of rationalizations why FCPS provided other unstated accommodations.

1

FCPS further argues that providing "full-time telework" to Plaintiff would have been unreasonable. However, FCPS never performed any individualized assessment of Plaintiff's job responsibilities, Plaintiff's needs, or FCPS's ability to make effective modifications or adjustments to meet Plaintiff's needs. FCPS further failed to identify any basis for its summary conclusion that telework was not possible in any meaningful way. When FCPS maintains that Plaintiff's taking of leave was a reasonable accommodation, FCPS ignores the obvious alternative to leave –temporary work from home– the one accommodation which would have most benefited both Plaintiff and FCPS. Temporary telework was the obvious and most effective accommodation at providing Plaintiff the safe working conditions she and her doctor recommended.

## FCPS's Statement of Undisputed Material Facts

1.  Not disputed. However, Plaintiff also worked for FCPS starting around 2005 as a German immersion teacher, working for FCPS for 14 years prior to starting her position at BES. *See* PTX012-C, p. 12-13, L20-22; 1-14.

2.  Not disputed. Additionally relevant: Title I schools have more resources than non-Title I schools to employ resource teachers, a position which does not exist at every FCPS school. *See* "PTX015" ¶¶11-12, *Declaration II of Donna Jones*. FCPS's website describes a resource teacher's role in part as: "Title I schools leverage resource teachers who are highly skilled in literacy or mathematics to co-lead a systematic school-wide effort to develop teacher leadership and address focused areas identified for continuous instructional improvement." *See* PTX016-002 (www.fcps.edu/about-fcps/performance-and-accountability/title-i/title-i-grant-overview). The FCPS description discusses developing teacher leadership, not working with students.

2

3. Disputed. Plaintiff was not an interventionist. *See* PTX002-003; *see also* "PTX015" ¶¶9, 13. Plaintiff's role did not include substitute teaching, and substitute teaching prevented Plaintiff from performing the essential functions of her role as Math and Science Resource Teacher. Requiring a resource teacher to substitute as part of a resource teacher's role also contravenes the purpose of Title I funding for the special role of a resource teacher. *See* PTX015, ¶11. Plaintiff's essential job functions did not involve working directly with students. *See* PTX002-003-5. *See also* PTX015 ¶¶8-9.

4. Disputed. Plaintiff did not spend much of her day managing inventory and resources, if only a handful of days out of the school year. Plaintiff identifies potentially a minimal 2% of her job entailed the functions of Paragraph 4, and that those tasks were shared with other resource teachers. *See* PTX002-005(¶6).

5. Disputed. Ms. Jackson-Muir's statement is vague and conclusory. Plaintiff's essential job functions did not include attending in-person classes, co-teaching, working directly with students in the classrooms or one-on-one as needed. *See* PTX002-003-5.

6. Not disputed. However, Plaintiff's essential job functions all could be performed virtually. *See* PTX002-003-5; *see also Declaration of Monica Kim*, "PTX017", ¶¶3-9. *See also*, PTX012-C, p. 128-129; L10-22; 1-3.

7. Not disputed. However, at various times Plaintiff worked from BES when students attended virtually. *See* PTX012-C, pp. 20-21, L17-22; 1-22.

8. Disputed generally. FCPS's statements are conclusory and without factual support.

9. Disputed generally. FCPS's statements are conclusory and without factual support.

10. Disputed. Plaintiff was not stating it is better to be at BES during the times she needed respite from the environmental factors at BES in 2022. *See* PTX012-C, p. 200, L5 – p. 201,

3

L15. "I mean, obviously, it's better to be there, but when safety is compromised, I think I had practiced for a full year and demonstrated that I could do multiple subjects across all grade levels successfully." *See* <u>PTX012-C</u>, p. 201, L11-15.

11. Disputed in part. The project was not a renovation, but a full-scale 2-3 year construction project, adding over 40,000 square feet of building. *See* <u>PTX01</u>-002-006.

12. Disputed in part. The construction of the new wing was not completed in early-to-mid April 2022. Renovations to the gym were not completed in the summer of 2021. Not all operations moved into the "newly constructed" wing. *See* <u>PTX012-E</u>, p. 40, L5-14. *See also* <u>PTX014</u>-005-012, 014-016, 018, 083 "Construction Area Key, FCPS 1542".

13. Not disputed generally. However, construction is more accurate than renovations. Construction was around Room 2A at the time. Ms. Jones and Ms. Kim participated in moving the items from 2A to Room 38. *See* <u>PTX012-C</u>, p. 28, L11-17. *See also* <u>PTX01</u>-002-006.

14. Disputed in part. Any request of Mr. Brock to inspect for mold was only a request for Mr. Brock to inspect for "visible" mold, not mold generally. *See* <u>PTX012-D</u>, p. 59, L10-17, p. 60, L14 – p. 61, L5.

15. Disputed. The amount of mold was not "small". Mr. Brock did not inspect for all mold, only visible mold, so no conclusion as to the amount of mold present can be made. Any remediation efforts also did not treat any airborne mold. *See* <u>PTX012-B</u>, p. 319-320.

16. Disputed in part. Mr. Brock is not in charge of whether or not furniture is "cleaned properly" only to inspect for visible mold.

17. Disputed. Facts do not support any conclusion of the room being "free and clear of mold", which is directly contradicted by his scan for only "visible mold". It is also unclear what

effect, if any, to give the summary because Mr. Brock's IAQ indicated the room was free and clear of mold as of 8/30/21, an impossibility as Room 38 was inaccessible to Mr. Brock on that date. *See* <u>PTX012-D</u>, p. 59, L10-17; p. 60, L14 – p. 61, L5; p. 69, L17 – p. 71, L18. Furthermore, Mr. Brock's methodology could not determine if a room was "free and clear of mold". Mr. Brock only performs a visual inspection, using a flashlight and turning off the lights to perform his visible inspection for mold. *See* <u>PTX012-D</u>, p. 60, L14-18. Mr. Brock states that "there's mold spores everywhere, no matter where you go. So mold doesn't become a problem until it's actually growing on surfaces. So that's the purpose of doing a visual inspection". *See* <u>PTX012-D</u>, p. 61, L1-5. Any conclusions on air quality were also suspect. Almost all assessments were done in the morning when $CO_2$ levels are lowest. *See* <u>PTX012-D</u>, p. 50, L2-17. Mr. Brock did not consider construction/renovation related factors in his air quality assessments, such as open ceiling tiles or holes in walls, cracks in doors, welding odors, or other structural issues that might affect air quality "because… the design and construction has their own safety person that takes care of that type of stuff." *See* <u>PTX012-D</u>, p. 87, L5 – p. 92, L21. Mr. Brock indicates he does not look for dust in performing an IAQ but only significant dust. *See* <u>PTX012-D</u>, p. 55, L22 – p. 56, L9. Mr. Brock indicates that dust "can sometimes be an allergen because of dust mites, so – and dust can also serve as a food source for mold." *See* <u>PTX012-D</u>, p. 56, L10-16. While Mr. Brock indicates mold is a growing organism, which is relevant to the fact only one air sampling was performed in this matter (*see* Paragraph 20 below). *See* <u>PTX012-D</u>, p. 56, L18-19.

18. Disputed. Mr. Brock surmised that the air ventilator was working, but did not try to turn it on. *See* <u>PTX012-D</u>, p. 80, L7 – p. 82, L15. The air ventilator had not been working and

there are no facts to support the conclusion Mr. Brock made as to why the ventilator was not functioning properly. *See* PTX012-D, p.43, L6 – p.44, L7.

19. Disputed. There is no evidence in the cited exhibits as to the reasons stated for why Mr. Brock performed inspection.

20. Disputed. The air sampling report specifically did find mold in Rooms 34, 35, 36, 37, 38, and 39. *See* PTX008-013-15; Mr. Robertson states: "Countable mold, such as those identified in this case, have no established Permissible Exposure Limits (PELs) or Threshold Limit Values (TLVs) and currently no federal agency has clear authority to regulate exposure to biological agents such as mold." *See* PTX008-012. The analysis by FCPS Environmental Specialist Isaac Robertson improperly stated that "there was no amplification of mold" compared to the outside control sample. The report identified elevated levels of *basidiospores* in Rooms 34, 36, 38, and 39, elevated levels of *Penicillium/Aspergillus group* in Rooms 34, 35, 38, and 39, and levels of *Chaetomium* in Room 34 not found elsewhere, even in the outside sample. *See* PTX008-013-15. Furthermore, the air sampling was only performed after attempts to clean mold, and not on successive dates to determine if there was recurring mold growth or to compare pre-cleaning levels and post-cleaning levels of mold. *See* PTX009-031 (Mr. Brock states: "Please know that we only perform air sampling after cleaning is performed and the space is determined to be free and clear of visible mold after performing a followup inspection/s."). Mr. Brock's assessments of "no mold" could not be confirmed since his conclusions were not supported by anything other than a visual inspection. *See* PTX012-D, p. 60, L14-18. The Lab Report from Aerobiology Laboratory Associates, Inc. states: (3) "[A] high basidiospore count indoors may be indicative of a wood decay problem or wet

6

soil." *See* PTX008-016. Rooms 34, 36, and 38 faced the outdoor area between the gymnasium and kitchen where construction occurred, to include digging up soil. *See* PTX001-001; *see also* PTX002-012-13.

21. Not disputed. Minutes from FCPS recount the meeting. *See* PTX009-057-61 (D. Jones 000526-532).

22. Disputed in part. The five alternative workspaces were not adequate workspaces. *See* PTX012-C, p. 58, L9 – p. 61, L6.

23. Disputed. There was no IAQ report by Mr. Brock. Plaintiff disputes Mr. Brock's testimony, stating Mr. Brock told her he found "significant dust" not "light dust" and witnessed Mr. Brock's purported inspection, which did not include looking through the shelves in the room. *See* PTX012-C, p. 62, L4-22. Also, Mr. Brock could not conclude "no issues with mold" or "no mold" using his no "visible" mold methodology. Mr. Brock did not have sufficient facts to determine whether or not the "air quality" was "satisfactory" in general or in particular for Plaintiff. *See supra* Paragraphs #14-20.

24. Disputed. The characterization of "routinely" is misleading and untrue. There also were no recorded inspections of all of Plaintiff's workspaces within BES. *See* PTX012-D, p. 109-110, L15-22; L1-22.

25. Not disputed.

26. Not disputed.

27. Disputed. Ms. Jackson-Muir declined to offer Plaintiff telework as part under her administrative authority and that may have been the reason Ms. Jackson-Muir requested Plaintiff to fill out accommodation paperwork. *See* PTX012-E, p. 25, L15 – p. 26, L21; p. 34, L12 – p. 35, L16.

28. Admitted in part. Plaintiff previously submitted a request for reasonable accommodation January 30, 2022, and made similar requests leading up to February 7, 2022. *See* PTX005-001-009. Plaintiff was also forced to state she may need to take sick leave because she was not offered other leave as an accommodation and was not granted telework by Ms. Jackson-Muir. *See* PTX005-001-009. *See also* PTX012-C, p. 237, L8-14.

29. Disputed. Dr. Halabi was recommending temporary telework as the primary recommendation. Dr. Halabi did indicate that Plaintiff 's disability limited her "working" and was a "respiratory" major bodily function limitation. *See* PTX005-018 (Part II(¶5)). FCPS makes improper conclusions based on the misleading nature of the form, which includes Part I, which was faxed by the doctor's office to FCPS, along with Section II, in the context of and in support of the main request of Part I. *See* PTX005-017-021. FCPS did not question Dr. Halabi's medical opinion. *See* PTX011-001.

30. Disputed. Ms. Gibson's correspondence and testimony contradicts the statements of paragraph 30. The discussion of leave was not in the context of an accommodation under the ADA. *See* PTX012-F, p. 31, L22 – p. 34, L4.

31. Disputed. The fax from Dr. Halabi's office to FCPS included the clear request for telework on a post-it note. The request was not "extended", as the prior request for temporary telework beginning February 7, 2022 was not granted. *See* PTX013-001-002, 014.

32. Not disputed. The purpose of Ms. Gibson's call was to explain denial of Plaintiff's requests, not to generally discuss the request for accommodation.

33. Disputed. The phone call took place on February 17, not 18. Ms. Gibson was not offering leave as an accommodation. Plaintiff believed she could perform her essential job functions by telework because she knew her job functions could be performed remotely and knew

the importance of continuing to perform her job functions instead of taking leave. Ms. Gibson did not state that 5-day a week telework could not be accommodated, but stated that telework generally as a rule could not be accommodated. *See* PTX012-F, p.71, L12-15, p. 76, L7-12, p. 77, L16-21. *See also* PTX005-043-044.

34. Not disputed. This is inapplicable to the accommodation process.

35. Disputed. Plaintiff, under duress from her worsening condition, wrote what Ms. Gibson directed her to write, to include what Plaintiff understood summarized the limited things FCPS was willing to offer Plaintiff. *See* PTX005-043-044, 048, 059 p. 2-3. *See also* PTX012-F, p. 107, L15 – p. 108, L7.

36. Disputed. Plaintiff's "original requests" were not contained in the email. Ms. Gibson was not making "clarifying" questions, but rather questioning questions casting doubt on FCPS's ability to accept the line items. *See* PTX005-045-046, 050-051.

37. Disputed. No extensive testing had been done at any time. It was not demonstrated that "any mold had been remediated". No testing was done for Plaintiff's disability. *See supra* Paragraphs #14-20. *See also* PTX012-D, p. 102, L11-16.

38. Disputed. Ms. Gibson could not have determined from Ms. Jackson-Muir that "any concerns of mold already had been remediated". Neither Mr. Brock nor Ms. Gibson had any factual basis to conclude that "Ms. Jones' workplaces were free of mold." Ms. Gibson was not a qualified mold professional and the tests referenced did not establish in any way that Ms. Jones' workspaces were free of mold. *See* PTX012-F, p. 43, L15 – p. 44, L3. *See also supra* Paragraphs #14-20.

39. Disputed. Telework on Thursday mornings was not an actual accommodation because it was *de minimis*. *See* PTX012-F, p. 93, 108. *See also* PTX11-001.  Ms. Jackson-Muir only

described to Ms. Gibson what would cause the least impact possible on BES's daily operations, and did not discuss accommodations in any meaningful way. *See* PTX012-E, p.100, L16 – p. 101, L2. If Ms. Jackson-Muir stated what she believed Plaintiff's job duties to include, Ms. Jackson-Muir stated Plaintiff's essential job functions incorrectly.

40. Disputed. No determination of "free of mold" was made nor could be made. *See Supra* Paragraphs #14-20. The "additional accommodations" were token or false accommodations which made no impact whatsoever on Plaintiff's job or on BES's operations. *See* PTX012-C, p. 137, L16 – p. 138, L13. Even the 10-minute mask break was not ultimately offered.

41. Disputed in part. Plaintiff only accepted that those were the only things FCPS would offer her.

42. Disputed in part. Plaintiff had not accepted the accommodations and they were token or false accommodations. Plaintiff already received free PPE from FCPS and BES so did not need more. *See* PTX012-F, p. 94, L12-20.

43. Not disputed generally. Plaintiff had only requested temporary telework, not full-time telework. *See* PTX012-F, p. 71, L12 – p. 72, L16.

44. Disputed. The conclusions included as to the impossibility of telework are disputed, and it appeared to be Ms. Jackson-Muir's determination, which Ms. Gibson accepted as true without further inquiry.

45. Not disputed, except to characterizations and the incorrect job title of Plaintiff.

46. Disputed. Plaintiff's doctor was requesting telework as the recommended accommodation in keeping with every other request FCPS denied previously. *See* PTX005-079-083. *See also* PTX013-012-017.

47. Disputed. Ms. Gibson did not have any credible knowledge of mold in Ms. Jones's workspace, and any alleged remediation from 2021 had no bearing on the condition of Ms. Jones's workspace in 2022 or any particular relevancy to Ms. Jones's particular disability. *See supra* Paragraphs #14-20.

48. Disputed. Dr. Williams made conclusions based on his medical expertise. FCPS did not credibly call into question any medical opinion of Plaintiff's doctors. *See* <u>PTX011</u>-001.

49. Disputed. Many areas of BES were under construction and construction was occurring campus-wide, contravening Ms. Jackson-Muir's May 17, 2022 email claiming that the new building is free from construction. *See* <u>PTX014</u>-005-012, 014-016, 018, 083 "Construction Area Key, FCPS 1542". The "new part of the building" was connected to the "old part of the building" such that air flowed freely between. *See* <u>PTX015</u> ¶¶20. Construction was occurring around the trailers. *See* <u>PTX015</u> ¶¶19.

50. Disputed. Plaintiff was moved to Trailer A-3 because of construction phases not because of any accommodation. *See* <u>PTX012-F</u>, p. 126, L18 – p. 127, L3. Ms. Gibson knew Plaintiff was requesting to telework, it is unclear why Ms. Gibson was asking for clarification.

51. Disputed. Plaintiff's essential job functions did not include substitute teaching, which prevented Plaintiff from performing her essential job function as a Math and Science Resource Teacher. *See* <u>PTX015</u> ¶¶7-12. FCPS ignored Plaintiff's concerns about COVID and her compromised lungs. *See* <u>PTX012-E</u>, p.100, L16 – p. 101, L2. *See also* <u>PTX012-F</u>, p. 86, L6-12.

52. Not disputed. Plaintiff only requested intermittent leave knowing that it was futile at this point to request telework, the accommodation requested and recommended by her doctor.

53. Generally not disputed. Plaintiff had a right to take sick leave without FCPS permission. The request for intermittent leave was approved.

54. Not disputed. Plaintiff only requested permission to attend a Zoom meeting from home while on leave for fear of discipline from FCPS if she performed work while on leave.

55. Disputed. Plaintiff believed her job was in jeopardy if left in the hands of Ms. Gibson and FCPS. Feeling threatened, Ms. Jones sought to transfer to another school on her own terms and avoid the dire consequences outlined in Ms. Gibson's March 2nd email. *See* PTX0015 ¶¶17.

## Plaintiff's Statement of Additional Relevant Facts

56. The ongoing construction at BES posed numerous threats to the health and safety of Plaintiff, to include exposure to mold accumulation via flooding and standing water inside and around the school and improperly functioning air-conditioning/ventilation (*See* PTX014-006-011, 016-017, 019 , 022-023, 032, 034-035, 040, 042, 046, 049, 053, 057, 059, 061, 068-075, 080), exposure to harmful toxins via chemical and tar fumes permeating the campus (*See* PTX014-007, 021, 025, 028, 054-055, 072), asbestos (*See* PTX012-D, p. 69, L3-12; p. 72, L16 – p. 75, L14), and debris falling from the ceiling (*See* PTX012-B, p. 49-50), and exposure to a heightened risk of COVID-19 via unmasked workers in the building (*See* PTX014-051).

57. Construction at BES lacked adequate safeguards to ensure Plaintiff would not be subjected to breathable toxins, dust, or humid conditions deleterious to her health and disability, to include holes/openings in walls/doors and unsealed openings around ducts and pipe sleeves (*See* PTX014-041-042, 045-046, 060-061, 069, 073-075, 080), frequent leaking and malfunctioning of water/gas pipes and connected equipment throughout the school (*See*

PTX014-006-009, 016-019, 022, 025, 039-040, 042-043, 046, 049-050, 053, 057, 059, 068), lack of ceiling tiles/grid in the corridors, classrooms, and other areas (*See* PTX014-023, 036, 055, 057-058), and frequent mistakes and/or otherwise unsafe conduct by construction personnel in close proximity to BES staff and students (*See* PTX014-001-007, 010, 012-018, 020-021, 023, 027-029, 034-037, 041-042, 045-049, 051-058, 060-061, 063, 065-067, 069-072, 074-076, 078-082).

58. At the time Plaintiff requested accommodation on and after January 30, 2022, FCPS was aware of ongoing air quality and health concerns to Plaintiff at BES for her immediate workspace, to include Room 38 and the rooms sharing a hallway with Room 38. *See* PTX009-001-002; *see also* PTX008-001-002; *see also* PTX012-D, p. 24, L5-18; *see also* PTX012-B, p. 23-24.

59. At the time Plaintiff requested accommodation on or after January 30, 2022, FCPS was aware of ongoing air quality and health concerns to Plaintiff at BES campuswide. *See* PTX009-040-053. Ms. Jackson-Muir even discussed BES's "currently antiquated ventilation system". *See* PTX009-024.

## **Standard of Review**

Under Fed. R. Civ. P. Rule 56, "summary judgment is appropriate only where there is no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine dispute exists if there is sufficient evidence on which a reasonable jury could return a verdict in favor of the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In evaluating the question, courts must view the evidence in the light most favorable to […] the nonmovant." *Id.* In so doing, facts are construed in the light most favorable to the non-moving party, with inferences made in

13

the non-movant's favor. *Id*., at 255. FCPS argues that it is entitled to summary judgment on the basis of the third and fourth elements of *Tartaro-McGowan*: "(iii) she could perform the essential functions of the position with a reasonable accommodation; and (iv) that the employer refused to make such accommodation." *Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 165 (4th Cir. 2024).

**Argument**

The purpose of an accommodation is to afford a disabled employee the opportunity to work. "A reasonable accommodation must be effective." *See U.S. Airways v. Barnett*, 535 U.S. 391, 400 (2002) ("the word 'accommodation'. . . conveys the need for effectiveness"). [A] reasonable accommodation should provide the individual with a disability with "an opportunity to attain the same level of performance, or to enjoy the same level of benefits and privileges of employment, as are available to the average similarly situated employee without a disability." 29 C.F.R. pt. 6130 app. § 1630.9. A reasonable accommodation must "enable a disabled employee to perform essential job functions." *Price v. Norfolk S. Corp.*, 2022 U.S. Dist. LEXIS 175238, *43 (E.D. Va., July 21, 2022) (*citing Merrill v. McCarthy*, 184 F. Supp. 3d 221, 238 (E.D.N.C. 2016) (citing 29 C.F.R. §1630.2(o)(1)(ii)). The amended ADA expanded the Act's coverage: "The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA." §1630.1(c)(4).

**I.      FCPS failed to provide any accommodation to Plaintiff**

In order to determine a reasonable accommodation, an employer must engage in the interactive process to determine the precise limitations of the employee in the workplace based on the disability, and potential accommodations to overcome those limitations. "Implicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process

to identify a reasonable accommodation." *Price v. Norfolk S. Corp.*, 2022 U.S. Dist. LEXIS 175238, *44 (E.D. Va., July 21, 2022), quoting *Haneke v. Mid-Atlantic Capital Mgmt.*, 131 App'x 399, 400 (4th Cir. 2005). "Such an interactive process "involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that might address those issues," as well as "bilateral cooperation, open communication, and good faith." *Id.*, *citing Allen v. City of Raleigh*, 140 F.Supp. 3d 470, 483 (E.D.N.C. 2015 (internal citation omitted). Additionally, the interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Wilson v. Dollar General Corp.*, 717 F.3d 337, 346 (4th Cir. 2013). FCPS failed to engage in any meaningful interactive process to identify the "precise limitations [of Plaintiff] resulting from the disability" of to identify "potential reasonable accommodations that could overcome those limitations". *Id.*

FCPS ignores those limitations (respiratory issues) Plaintiff repeatedly states to all relevant administrators and ignores Plaintiff's doctor's specific identification of respiratory limitations and working limitations therefrom. The *Interpretive Guidance on Title I of the Americans with Disabilities Act* (29 C.F.R. § 1630, appendix) outlines the specific process:

"[T]he employer, using a problem solving approach, should:

(1) Analyze the particular job involved and determine its purpose and essential functions;

(2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation; (3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position;

and (4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer." 29 C.F.R. 1630, *app'x* at p. 33 .

It is important to engage in the interactive process in good faith, because "the employer may not know enough about the individual's disability or the limitations that the disability would impose on the performance of the job to suggest an appropriate accommodation." *Id,* p.34. Similarly, an individualized assessment of the job "means analyzing the actual job duties and determining the true purpose or object of the job. Such an assessment is necessary to ascertain which job functions are the essential job functions". *Id,* p. 34. Once effective accommodations have been identified, after the necessary individualized assessment explored in good faith by the interactive process, then "the preference of the individual with a disability should be given primary consideration" while it is the employer's discretion to "choose between effective accommodations". *Id,* p. 34 Additionally, the purpose of §1630.9(d) "is to clarify that an employer […]may not compel an individual with a disability to accept an accommodation, where that accommodation is neither requested nor needed by the individual. *Id*., p. 35.

### A. Mold is One Component of Plaintiff's Deleterious Workplace Environment

FCPS argues that it "granted the accommodations recommended by Ms. Jones' pulmonologist". This is contradicted by Dr. Halabi and the correspondence between the parties, and particularly the post-it note faxed to FCPS. PTX013-014. FCPS acted as if it provided two accommodations to Plaintiff, going so far as to coerce Plaintiff into agreeing that those were the only two accommodations FCPS would identify and threaten Plaintiff's job if she declined FCPS's posture. PTX005-049, 60-62. FCPS argues that by responding to an OSHA complaint in November and December of 2021, FCPS somehow granted Plaintiff's doctor's suggestion to

16

ensure Plaintiff a mold-free environment made two months later in February of 2022. Reasonable accommodation is a fact specific and fact intensive matter, and while a "reasonable accommodation" may have "many possible solutions", an employer cannot after-the-fact choose an accommodation. *Tartaro-McGowan*, 91 F.4th at 167. Nor can an "accommodation" be ineffective. Regardless of FCPS's beliefs on mold at BES, any inquiry into Plaintiff's workplace environment, and any review of her correspondence between January 30, 2022 and June of 2022 would demonstrate BES was exacerbating Plaintiff's disability. Plaintiff provided notice to FCPS on numerous occasions that her workplace environment was deleterious to her health and condition. In response, FCPS forced Plaintiff to take false accommodations, threatened Plaintiff's job security if she did not, and questioned the legitimacy of the learned conclusions of Plaintiff's medical professionals.

### B. The entire BES Campus was Immersed in Construction

After almost three months of insistent refusal to allow Plaintiff the reasonable request of temporary telework, FCPS claims that it accommodated Plaintiff's January, February, March, and April requests "by granting leave and by allowing her to work in trailer A3 or only in classrooms in the newly constructed building", despite Plaintiff having a workspace in trailer A3 in April of 2022. Plaintiff did not request leave as an accommodation, until it was clear that FCPS would not allow telework by late May/early June. Plaintiff placed FCPS on notice throughout April and May of 2022 that working in person (denial of any accommodation) was not effective or conducive to her health. PTX005-075-76, 87, 97, 117, 121-132, 138, 143-144, 148-151.

During this time, Plaintiff requested telework numerous occasions, formally April 25 and May 17, 2022. PTX005-79-83, 87, 95-117. Plaintiff only requested intermittent leave because she was unaware she could request more than 2 consecutive days without supervisor approval.

PTX015-003, ¶14-17. After FCPS denied any meaningful accommodation to telework, Plaintiff had no remaining opportunity to request meaningful telework. None of Plaintiff's essential job functions involved substitute teaching, and any request for Plaintiff to substitute teach only took away Plaintiff's ability to perform her essential job functions as Math and Science Resource Teacher.

FCPS has not offered any credible proof that BES was "dust and mold free", particularly as FCPS does not discuss dust on a campus still immersed in construction. *See* PTX002-006-17 (photos taken May 17, 2022, to include -008, a view of the trailers and Trailer A3); PTX012-C, p. 51, L6-9. When not on leave, Plaintiff was stationed on duty at the gymnasium which was central to construction, construction surrounded Trailer A3, and air flowed freely between the old building and the newly constructed wing at BES. PTX015-004, ¶18-20; PTX012-C, p. 50, L19-21.

FCPS claims that the decision of reasonable accommodation begins and ends with its own judgment. This reasoning absolves employers of any responsibility under the ADA. FCPS's logic manifested itself in the threatening and bullying conversations Ms. Gibson had with Plaintiff, together with the runaround offered by FCPS, reverting all correspondence back to Ms. Gibson. PTX005-059-62.

The entire BES campus was in construction throughout 2022. By the time Plaintiff requested intermittent leave in early June, Plaintiff understood that FCPS would, under no circumstance, offer any level of meaningful telework, other than the virtual meeting to take place in early June.

### C. Leave Does not Fulfill Essential Job Functions

FCPS, two years after denying Plaintiff's repeated requests for accommodation, now argue that FCPS "also accommodated Ms. Jones by allowing her to utilize her sick leave or to apply for

an unpaid leave of absence". FCPS ignores the basic difference between telework and leave, to work from home or to not work at all. FCPS's logic is self-defeating: If Ms. Jones rejects the "accommodation" of leave and reports to work, she would then, as a result of that rejection, not be able to perform the essential functions of the job because she would then be working. Plaintiff summarized the issue: "I don't want to get behind. When I take sick days, I get behind. When I get behind, it's very difficult for me to catch up". PTX012-C, p. 105, L9-12.

When there is an available accommodation allowing an employee to work, leave is not a reasonable accommodation. "[G]ranting leave is not per se a reasonable accommodation." *Price v. Norfolk S. Corp.*, 2022 U.S. Dist. LEXIS 175238, *45 (E.D. Va., July 21, 2022) (quoting *Chalmers v. Intel Corp.*, 2014 U.S. Dist. LEXIS 12995, *11 (D. Ariz., Oct. 1, 2012) (*quoting Kranson v. Fed. Express Corp.*, 2013 U.S. Dist. LEXIS 154473, 2013 WL 5807795 *4 n.5 (N.D. Cal. Oct. 28, 2013). "Although an employer may choose among effective accommodations, "forcing an employee to take leave when another accommodation would permit an employee to continue working is not an effective accommodation." *Denese G. v. Dep't of the Treasury*, EEOC Appeal No. 0120141118 (Dec. 29, 2016) (*citing Mamola v. Group Mfg. Servs., Inc.*, 2010 WL 1433491 (D. Ariz. Apr. 9, 2010); *Woodson v. Int'l Bus. Machines, Inc.*, 2007 WL 4170560 (N.D. Cal. Nov. 19, 2007)). Thus, "absent undue hardship, an agency should provide reasonable accommodations that permit an employee to keep working rather than choosing to put the employee on leave." *Id*. See *Thersa v. Louis DeJoy, United States Postal Service*, Appeal No. 0120182764; Hearing No. 440-2018-00103X; Agency No. 4J-530-0028-17, *14 (U.S. EEOC June 23, 2021); N.B. *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 413-14 (4th Cir. 2015) ("Employment discrimination claims brought under Section 504 are evaluated using the same standards as those "applied under [T]itle I of the Americans with Disabilities Act of 1990.").

While the ADA envisions broad remedies for reasonable accommodation and identifies a non-exclusive list of common accommodations, leave is not identified in the specified examples of §1630.2(o)(2)(i)-(ii). As echoed in *Hannah v. United Parcel Service*, the only mention of leave as an accommodation in the *Interpretive Guidance* appendix is in the narrow circumstance of treatment: "[O]ther accommodations could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment". 29 C.F.R. §1630, *app'x*, p. 25; *Hannah v. United Parcel Serv.*, 72 F.4th 630, 636 (4th Cir. 2023) (finding that temporary leave may be reasonable if the employee will be able to recover and return to work). While temporary leave as an accommodation may serve some purpose in allowing the employee the opportunity to get treatment or recover, it is not immediately effective at enabling an employee to work. *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 185-186, n.5 (2nd Cir. 2006) (discussing that "the idea of unpaid leave of absence as a reasonable accommodation presents "a troublesome problem, partly because of the oxymoronic anomaly it harbors" -the idea that allowing a disabled employee to leave a job allows him to perform that job's functions –"but also because of the daunting challenge of line-drawing it presents." (*quoting Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 651-52 (1st Cir. 2000) (O'Toole, J., dissenting)); *and see Hannah*, at 637 ("While a period of unpaid leave might not always be a reasonable accommodation, such leave may be reasonable where the disability that interferes with an employee's capacity to complete assigned tasks is temporary and there is reason to believe that a leave of absence will provide a period during which the employee will be able to recover and return to work").

Leave, like reassignment, is an accommodation of last resort, should there be no other effective accommodations available, as determined after a good faith bi-lateral interactive process. While FCPS cites *Tartaro-Mcgowan v. Inova Home Health, LLC* for the proposition that the

20

employer has first and final say over any accommodation offered, the Fourth Circuit identified the necessity of the employee and employer working together in finding a reasonable and effective accommodation. While the employer offered on four occasions modified work arrangements, Tartaro-McGowan "flatly and repeatedly rejected Defendant's proposed accommodation and refused to propose any alternative". *Tartaro-McGowan v. Inova Home Health, LLC*, 2024 U.S. App. LEXIS 1074 *, *24-25, 91 F.4th 158, (4th Cir. 2024). Tartaro-McGowan also had effectively abandoned her job instead of accepting accommodations offered. *Id.*, at *10. The Fourth Circuit posited,

> "Perhaps Tartaro-McGowan would have a stronger argument had she actually given Defendants' proposed accommodation a chance. If in practice it proved to be the case that unanticipated circumstances beyond Tartaro-McGowan's physical ability arose with such frequency as to effectively render Defendants' accommodation impracticable, she could have sought an alternative accommodation at that time. But having never tried to perform a direct patient care field visit using the accommodation made available to her, Tartaro-McGowan can offer only vague conjecture that Defendants' proposed solution was not viable." *Id.*, at *30-31.

The Fourth Circuit states that "future courts must evaluate each case based on its own particular circumstances." *Id.*, at *32. In this case, FCPS can only offer their own "vague conjecture" that telework was not possible for any temporary amount of time, even as little as two days. And in turn, FCPS failed to offer any actual accommodation to Plaintiff.

## II.     FCPS Failed to Provide Temporary Telework as a Reasonable Accommodation

*A.     FCPS failed to appreciate that Plaintiff and her doctor were requesting temporary telework, not permanent telework.*

21

Unlike leave, telework afforded Plaintiff and FCPS the benefit of Plaintiff performing her essential job functions as Math and Science Resource Teacher at a Title I school. PTX002-003-5; PTX015-003, PTX016; *see  Hannah v. United Parcel Serv.*, at 636 (deciding whether or not leave could serve the purpose of the employee ultimately returning to work); *also see Graves v. Finch Pruyn & Co.*, at 185-186 (discussing whether or not there was a material issue of fact on the indefinite nature of leave offered in the context of what amount of temporary leave might be reasonable). Plaintiff believed she could perform her job duties remotely. PTX002-003-5. *Cf. Crews-Sanchez v. Frito-Lay, Inc.*, (4th Cir. Feb 7, 2024) (where the Environmental Health & Safety Manager responsible for worksite regulatory compliance conceded that her essential job duties required her presence onsite at the time the employee requested telework) (as described in *Crews-Sanchez v. Frito-Lay, Inc.*, 2022 U.S. Dist. LEXIS 125901 *2 (W.D. Va. July 15, 2022)). While working from home, Plaintiff would have been reporting to work, even if not physically on site. *Cf. Tyndall v. National Educ. Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994) (N.B. decided prior to amended ADAA of 2009 expanding the reach of the Act) (finding an employee was not a qualified individual with a disability, where a frequently absent employee classroom teacher admitted the employer had not refused requests for accommodation, and employee requested time off unrelated to the employee's disability).  Unlike taking leave, Plaintiff would not have been absent from work while teleworking.

The *Interpretive Guidance* appendix contemplates circumstances where a temporary accommodation may be an appropriate remedy where the same accommodation on a permanent basis would not be appropriate. While "hiring an outside professional ("job coach") to assist in job training" is "not synonymous with reasonable accommodation", "an employer, under certain circumstances, may be required to provide […]a temporary "job coach" to assist in the training of

an individual with a disability". 29 C.F.R. §1630, *app'x*, p.32. Plaintiff was requesting temporary telework, not permanent telework. *Cf. Davis v. Wilkie*, 2020 U.S. Dist. LEXIS 238301 *(D.S.C. Oct. 8, 2020) (finding that a Medical Support Assistant employee working at a clinic front desk was required to interface with customers and patients was not entitled to telework on a permanent basis with a "flex schedule" where the employer was shown to have acted in good faith making efforts to accommodate the employee, and the employee's stated reason for telework was based on crying spells caused by depression).

The temporary nature of an inconvenience on a workplace must be considered as part of assessing the accommodation's reasonableness. The ADA does obligate employers to make efforts to accommodate employees with disabilities, which does foresee inconvenience. "Providing personal assistants, such as a page turner for an employee with no hands or a travel attendant to act as a sighted guide to assist a blind employee on occasional business trips, may also be a reasonable accommodation." 29 C.F.R. §1630, *app'x*, p. 25. The Act foresees reasonable job restructuring, and the reallocation or redistribution of nonessential or marginal job functions, such as Plaintiff's limited unpacking and shelving of school resources. *Id*.; 1630.2(o)(2)(ii). *Cf. Lewis v. Gibson*, 621 Fed. Appx. 163 * (2015) (dismissing a failure to accommodate claim because the employer requested to decrease performance standards thereby changing essential job functions, reducing workload, and requesting an assistant where the employee had a record of poor performance and could not show that he was a qualified individual under the ADA).

Ms. Gibson stated that one week of telework "was not possible due to [Plaintiff's] essential job functions", and further stated that two days of telework was also not possible because "[i]t's still based on the individual's job." <u>PTX012-F</u>, p. 121, L2-12. Ms. Gibson further identified that, to her, the interactive process occurs after deciding if an initial accommodation can be granted,

stating: "If we're not able to grant what their initial request is, we go through this lengthy interactive process and determine what accommodations we can provide." PTX012-F, p. 107, L15-22. For Ms. Gibson, she already had asked Ms. Jackson-Muir, without any context of Plaintiff's disability, if telework could be accommodated. Without any determination of the extent of Plaintiff's job which could be performed remotely, Ms. Gibson concluded that telework in any meaningful amount (even two days) could not be accommodated. Then, only then, did Ms. Gibson believe she began the interactive process, "interacting" with Plaintiff.

FCPS relies again on the reasoning that telework was not reasonable because it did not allow Plaintiff to perform her job. However, FCPS does not demonstrate any understanding of Plaintiff's actual essential job responsibilities. Despite no factual basis, FCPS argues that Ms. Jones's position is similar to that of an elementary school principal as described in *Jordan*. See *Jordan v. Sch. Bd. Of the City of Norfolk*, Case No. 2:22-cv-167, 2023 WL 5807844, at *8-11 (E.D. Va. Sept. 7, 2023). Similarly, an employer cannot change an employee's job functions in order to avoid accommodating the employee's request for reasonable accommodations, which would deprive a disabled individual of the privileges of employment. *See* §1630.4(ii), (iv), (v), §1630.5, §1630.9(b), (d), §1630.12 (retaliation). Additionally, reassignment cannot be used to the disadvantage of the disabled employee seeking accommodation. See PTX005-60. Even though reassignment is listed as a potential reasonable accommodation, it "should be considered only when accommodation within the individual's current position would pose an undue hardship. [...]Reassignment may not be used to limit, segregate, or otherwise discriminate against employees with disabilities by forcing reassignments to undesirable positions or to designated offices or facilities." 29 C.F.R. part 1630, *app'x*, p. 26. In arguing that substitute teaching was an essential job function of Plaintiff, FCPS attempts to change Plaintiff's clear, direct, and Title I

24

mandated essential job functions simply to avoid liability for rejecting any reasonable accommodation for Plaintiff.

Determining Plaintiff's essential job functions is a fact intensive process. A job function may be considered essential for a number of reasons, including:

"(i) The function may be essential because the reason the position exists is to perform that function; (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. §1630.2(n)(2).

A factfinder must consult a full range of evidence in determining whether or not a job function is essential. 29 C.F.R. §1630.2(n)(3)(i)-(vii); *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020) (discussing the relevancy of a written job description, senior officials' testimony, and testimony of "those familiar with the daily requirements of the job"). Plaintiff and her co-worker are the most familiar individuals of the daily requirements of the resource teacher position Plaintiff held. Certain functions that FCPS cites as essential do not fit with the purpose of Plaintiff's position: to help teachers improve Title I achievement metrics. PTX015-003, ¶11-12. The data driven nature of Plaintiff's job was time-intensive and any task outside of her essential job functions prevented Plaintiff in part from performing her essential tasks. PTX012-C, p. 16-17, L3-22, L1; p. 105, L10-12 ("When I get behind, it's very difficult for me to catch up because of all the things I have explained to you"). Notably, substitute teaching directly prevented Plaintiff from performing her full-time job as a Math and Science Resource Teacher. Plaintiff was not hired

to be a substitute teacher and time away from her role as Resource Teacher invariably would force Plaintiff to perform work central to her essential job functions outside of the designated workday.

FCPS reasons that because Plaintiff performed her job on the BES campus, that therefore none of her essential job functions could be performed away from BES. FCPS believes that, independent of Plaintiff's job functions, being on the BES campus was in and of itself an essential job function. Contrary to FCPS's unfounded belief, Plaintiff did not teach students. Plaintiff did not provide the "hands-on guidance and support" as an essential job function. A Title I Resource Teacher is funded and hired to analyze testing performance data and serve as a resource to help improve the classroom teacher's methodology. While FCPS and Ms. Jackson-Muir undoubtedly preferred Plaintiff to work in person, there is no credible evidence to suggest Plaintiff could not perform her essential job functions remotely for the temporary time periods her doctor recommended.

### B.  The "Limited Telework" was not an Accommodation

Attending Thursday morning virtual meetings from home for a handful of weeks was not an accommodation for Plaintiff's disability. Free PPE was not an accommodation for Plaintiff. FCPS has demonstrated that the only goal its administration had in the interactive process was to determine what conditions already existed that FCPS could call accommodations that would also have the least amount of impact on BES operations. FCPS argues that prior actions, which FCPS would have done regardless of Plaintiff's requests for accommodation, constituted granting of accommodations to Plaintiff. Not only did FCPS fail to accommodate Plaintiff, but FCPS attempted to force Plaintiff to agree that the token "accommodations" offered were actually accommodations.

### **Conclusion**

26

FCPS failed to perform any individualized assessment of Plaintiff's essential job functions, failed to identify the precise limitations of Plaintiff's disability or how the limitations affected Plaintiff's performance of essential job functions, and failed to identify any reasonable accommodations for Plaintiff. In so doing, FCPS refused to accommodate Plaintiff in January, February, March, April, May, and June of 2022. FCPS is not entitled to summary judgment.

DATED: March 15, 2024           DONNA JONES, *Plaintiff*
                                By Counsel:

                                OBED LAW, PLLC

                        By:  _____/s/_____
                                Seth James B. Obed, VSB #82482
                                Robert M. Bohn, VSB#96888
                                OBED LAW, PLLC
                                429 N Saint Asaph St.
                                Alexandria, VA 22314
                                [t](703) 567-4052; [f](703) 894-4940
                                sobed@obedlaw.com
                                ***Counsel for Plaintiff***