IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| DONNA M. JONES, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Civil Action No. 1:23-cv-00359 (AJT/LRV) |
| ) | |
| FAIRFAX COUNTY SCHOOL BOARD, ) | |
| ) | |
| *Defendant*. ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

In this Americans with Disabilities Act action, the parties have filed cross-motions for summary judgment with respect to liability on Count II, the sole remaining claim in this case, which alleges a failure to accommodate Plaintiff's disability. [Doc. No. 52] ("Plaintiff's Motion"); [Doc. No. 49] ("Defendant's Motion").[1] A hearing was held on March 27, 2024, after which the Court took the Motions under advisement. For the following reasons, Defendant's Motion is **GRANTED** and Plaintiff's Motion is **DENIED**.

**I. BACKGROUND**

Plaintiff Donna Jones ("Jones") is a resident of Springfield, Virginia, who has worked as an employee of Fairfax County Public Schools ("FCPS") since 2005 and continues to be employed by FCPS. [Plf. Ex. 12-C] (Jones's Dep. Tr.) at 12. During the relevant period for this case, the 2022 Spring Term, Jones worked as a science and math resource teacher for kindergarten through second grade at Braddock Elementary School ("Braddock") and had done so since August 2019. *Id.* at 13–18.

---

[1] By Order dated September 20, 2023, [Doc. No. 16], the Court dismissed for failure to state a claim Count I (discrimination on the basis of disability) and Count III (retaliation for engaging in a protected activity).

1

During Jones's period of employment at Braddock, the school building and campus were under construction in various phases, such that different portions of the campus were renovated at different times. [Doc. No. 1] at ¶¶ 13, 20–24, 28–29, 33; *see also* [Plf. Ex. 2] at 6–12. During the construction on campus, FCPS also remediated classrooms for mold, including Jones's classroom during the summer and fall of 2021, and conducted laboratory analysis later in 2021 to confirm that the mold had been eradicated. *See* [Def. Ex. 8] at 62–93; [Def. Ex. 9]. Professional laboratory analysis conducted in December 2021 indicated that certain mold counts were elevated in certain rooms, including rooms in which Jones worked, and recommended additional cleaning, but also noted that "[d]uring the heating season (winter), any indoor [mold] counts may appear to be elevated due to the significantly decreased number of outdoor molds. Aerobiology Laboratory Associates typically cites spore counts of up to 1000 for any one mold group or species to be acceptable for good indoor air quality. These results were well below that unofficial standard." [Def. Ex. 9].

As alleged in the Complaint, and subsequently established in the record, on January 28, 2022, Jones was diagnosed with "Reactive Airway Disease" (hereinafter, "RAD"), a respiratory disease with symptoms similar to asthma. [Doc. No. 1] at ¶¶ 12, 49; *see also* [Def. Exs. 11, 13, 20]. Her pulmonologist, Dr. Halabi, also identified nodules in Jones's lungs, and she was scheduled for lung surgery to remove the nodules on February 8, 2022. [Doc. No. 1] at ¶¶ 49, 50, 54, 60; [Def. Ex. 11]. Jones alleges that the construction dust at Braddock, along with the presence of mold, exacerbated the RAD symptoms and prolonged her recovery.[2]

---

[2] Not at issue in this case is whether Jones's exposure at her school to dust or mold, or some combination of the two, caused Jones's RAD to develop, although Jones has brought a workers' compensation claim alleging such a causality. *See* [Def. Ex. 1] at 193.

On January 12, 2022, when Braddock officials first met with Jones to discuss her concerns about the air quality of the resource room in which she worked ("Room 38"), FCPS offered her five alternative workspaces to which she could move. [Def. Ex. 1] at 58–61; [Def. Ex. 3] at 77–79; [Def. Ex. 8] at 94–98. Jones "proposed that she use a different room, Room 34," which was approved. [Doc. No. 50] ¶ 22; *see also* [Def. Ex. 1] at 58–61; [Def. Ex. 3] at 77–79. Jones was also provided with air purifiers for both Room 38 and Room 34. Further visual inspections for mold were conducted throughout the remainder of the winter and spring. [Def. Ex. 1] at 44; [Def. Ex. 8] at 106, 115; [Def. Ex. 10].

On January 30, 2021, Jones contacted the Braddock school principal, Keesha Jackson-Muir ("Jackson-Muir") to informally request a temporary accommodation of telework to address both her RAD condition and her recovery from the then-scheduled surgery. [Def. Ex. 11]. Jackson-Muir directed Jones to complete the required ADA forms. *See id.* Jones also spoke by phone that same day to Lori Gibson ("Gibson"), Senior ADA Specialist for FCPS, and by follow-up email on February 1, Gibson directed Jones to complete the required ADA forms. [Plf. Ex. 5] at 4. In that same correspondence, Gibson also informed Jones that her request for telework would not likely be approved because telework was not approved for school-based positions, [Plf. Ex. 5] at 4, although Jones recalls that Gibson had previously indicated on a phone call that the telework would probably be acceptable for a short period of time. *See* [Plf. Ex. 12-C] at 109–10.

On February 7, Jones submitted her first accommodation request form in which she reiterated her request for telework and included an accompanying physician's note. [Doc. No. 1] ¶ 55; [Def. Ex. 11]. Specifically, Jones requested telework "for the duration of recovery following this lung procedure," noting an accommodation end date of February 28, 2022. [Doc. No. 1] ¶ 57; *see also* [Doc. No. 1-2] at ¶ 34; [Def. Ex. 11] at 5. However, the treating physician, Dr. Halabi,

3

described Jones's specific medical condition as lung nodules due to "mold exposure" and therefore recommended "telework *to avoid mold exposure* at work." [Def. Ex. 11] at 5 (emphasis added).

On February 15, Jones submitted her second accommodation request form, again seeking telework as an accommodation, but this time through March 31, with another physician's note from Dr. Halabi. [Doc. No. 1-2] ¶ 40; [Def. Ex. 13]. The note contained the same recommendation as the previous note regarding avoiding mold at work. *Compare* [Def. Ex. 13], *with* [Def. Ex. 11]. Two days later, Gibson informed Jones that, as previously indicated, her request for telework would not be granted because of "the essential functions of [her] job," and in a March 2, 2022 email, she detailed some of those functions. [Doc. No. 1] ¶ 62; [Plf. Ex. 5] at 33, 55; *see also* [Def. Ex. 3] at 60. Jones disputed that the essential functions of her position required her to work in person because she had successfully performed her job over Zoom during the COVID pandemic. [Doc. No. 1] ¶ 63; [Plf. Ex. 5] at 53–54; *see also* [Def. Ex. 4] at 52–53. Following these interactions, which included communicating with Jackson-Muir about what was feasible, Gibson on behalf of FCPS offered Jones two accommodations: working remotely on Thursday mornings and providing Jones with additional personal protective equipment ("PPE"). [Doc. No. 1] ¶ 71; [Plf. Ex. 5] at 49; [Def. Ex. 16]. Jones was asked if she accepted the accommodations offered, and she agreed in writing. [Def. Ex. 16]. Nevertheless, in April 2022, in a third accommodation request, Jones again requested a telework accommodation through May 31. [Doc. No. 1] ¶ 86; [Def. Ex. 20]. That accommodation request was denied, but Gibson asked if Jones wanted to rescind the accommodations accepted and move to the next stage in the interactive process. [Doc. No. 1] ¶ 87; [Plf. Ex. 5] at 66–67. Jones declined. [Plf. Ex. 5] at 66.

In mid-May, Jones submitted a final request for telework along with paperwork from a new treating physician, Dr. Williams, which specified for the first time that Jones's condition could be

4

triggered by construction dust in addition to mold. [Def. Ex. 21]. In response, Gibson followed up with Braddock personnel to inquire about Jones's then-current working environment and learned that Jones had already been transferred to a trailer (a location referred to in the record as "A-3" or "A3"), away from the construction dust in the main building. [Def. Ex. 22]. Further, she learned that Jones was not required to assist with any classes in the main building and the areas where she would need to work were confirmed to include only the new facilities that were not under construction. *Id.* Gibson followed up with Jones to determine whether Jones was seeking additional accommodations in light of these changes, given the previous discussions about telework, but there is no evidence in the record that Jones responded. *See* [Def. Ex. 23]. At the end of the academic term, Jones was able to voluntarily transfer her employment to Graham Road Elementary School, within the FCPS system, where she remains employed by FCPS. [Doc. No. 1] ¶¶ 1, 18–19. On March 17, 2023, Jones filed her Complaint against the Fairfax County School Board ("FCSB") seeking compensatory and punitive damages.

## II.   LEGAL STANDARD

When reviewing a motion for summary judgment, the Court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The central question at the summary judgment stage is whether the nonmovant has produced enough evidence to demonstrate that a "dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the self-serving testimony or declarations of the non-moving party may be considered. *See Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 213 (4th Cir. 2017) (observing that a nonmovant's self-serving testimony is

generally admissible for defeating summary judgment if based on "personal knowledge or firsthand experience"); *Harris v. Mayor & City Council of Balt.*, 429 Fed. App'x 195, 198 n.5, 203 (4th Cir. 2011) (concluding that summary judgment was inappropriate, relying in part on evidence from nonmovant's affidavit). However, where the self-serving testimony is contrary to that non-moving parties' prior sworn testimony, that self-serving testimony may be "insufficient to stave off summary judgment." *See Coffey v. Chem. Specialties, Inc.*, 1993 WL 318886 at *3 (4th Cir. Aug. 20, 1993) (finding that a chief executive's statements in a self-serving, uncorroborated affidavit—which are contrary to his prior sworn testimony—were insufficient to create a genuine issue of material fact); *see also Bickenstaff v. Vassar College*, 196 F.3d 435, 455 (2d Cir. 1999) ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that ... contradicts the affiant's previous deposition testimony."); *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (observing that a party cannot create issue of fact by contradicting its own prior evidence); Fed. R. Civ. P. 56(e)(2).

## III.   DISCUSSION

The ADA requires that a covered employer make "reasonable accommodations to the known physical or mental limitations" of a qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on its business. 42 U.S.C. § 12112(a), (b)(5). Jones's sole remaining claim against FCSB is that it failed to reasonably accommodate her disability by declining to offer her a fully remote working environment during her recovery from two RAD-related surgeries in the spring of 2022.

To establish a *prima facie* case for failure to accommodate under the ADA, a plaintiff must show: "(1) that [s]he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [s]he

6

could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Wilson v. Dollar General Corp.*, 717 F.3d 337, 345 (4th Cir. 2013).

With respect to the fourth element, most courts have found that simply a good faith effort to accommodate is not sufficient to avoid liability for a failure to accommodate; however, liability will not be imposed on an employer if the employee has not established that an alternative reasonable accommodation existed. *See Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 962 (4th Cir. 2021) (observing that an employer "will not be liable" for failure to accommodate if the employee "ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position"); *see also Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233 (9th Cir. 2012) (finding that the employer reasonably tried to accommodate the employee, and because there was no alternative reasonable accommodation that existed, the employer was not liable for failure to accommodate); *Anderson v. JPMorgan Chase & Co.*, 418 F. App'x 881, 883 (11th Cir. 2011) ("While Chase's attempted accommodations were unsuccessful, Anderson showed no reasonable accommodation that would have allowed her to perform the essential functions of her job."); *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1102 (8th Cir. 1999) (similar).

FCSB does not dispute the first two elements of Plaintiff's *prima facie* case, *viz.*, that she had a qualifying disability and that FCPS had notice of it. Rather, FCSB contends that (1) Jones *was* provided with a reasonable accommodation by FCPS, which she at one point accepted, and, alternatively, (2) even if it had not offered Jones a reasonable accommodation despite trying to do so, Jones failed to introduce evidence sufficient for a factfinder to conclude that the accommodation Jones had repeatedly requested—fully remote telework—would have enabled her

7

to perform the essential functions of her job, *see* [Doc. No. 50] at 17–19, 22–27, or that there existed some other reasonable accommodation that she would have accepted.

Jones contends that the offered accommodations, which she accepted, were "token" accommodations since Braddock staff was already participating in Thursday morning meetings remotely, PPE was available to any staff that requested it, and, in any event, these accommodations did not sufficiently address her RAD disability because they still exposed her to environmental hazards at the school. [Doc. No. 68] at 14, 16. At the hearing, Jones argued that she was, as a practical matter, forced to accept them and that as a consequence, her literal acceptance should not be deemed controlling. Additionally, in briefing she argues that her requested accommodation of telework was "reasonable" because she could complete all of the essential functions of her job in a fully remote environment. [Doc. No. 68] at 22. The Court addresses in turn whether FCPS provided a reasonable accommodation, and if not, whether the accommodation that Jones requested allowed her to complete the essential functions of her position and was therefore "reasonable."[3]

### A. *There are disputed material facts that preclude summary judgment for either party on whether FCPS provided Jones with a reasonable accommodation.*

A reasonable accommodation is one that "enable[s] [a qualified] individual with a disability ... to perform the essential functions of [her] position." 29 C.F.R. § 1630.2(o)(1)(ii). The ADA enumerates a non-exhaustive list of reasonable accommodations, including (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, or other similar

---

[3] At oral argument Jones submitted that she may have accepted something less than full-time telework as an accommodation but failed to explain how that position squared with her core position throughout the litigation that her RAD condition required temporary but full-time telework.

8

accommodations. 42 U.S.C. § 12111(9); *see also* 29 C.F.R. § 1630.2(o)(2). An employer may reasonably accommodate an employee in these enumerated ways, among others, without providing the accommodation that the employee requested. "Rather, the employer may provide an alternative reasonable accommodation." *Reyazuddin v. Montgomery Cnty., Maryland*, 789 F.3d 407, 415 (4th Cir. 2015).

To establish that an accommodation was reasonable, the moving party must "present evidence from which a jury may infer that the [identified] accommodation is reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012). And for the purposes of determining what reasonable accommodations may be available, an employer may reasonably rely on the accommodations specified by a treating physician, even when those recommendations are different than the employee's requested accommodation. *See Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 379 (4th Cir. 2022) (holding that the doctor's note was controlling on the question of the accommodation needs, not the representations of the plaintiff). FCSB contends that FCPS did offer Jones a reasonable accommodation within the meaning of the ADA and that Jones affirmatively accepted its proffered accommodation. [Doc. No. 50] at 17–22.

In support of its position, FCSB points to four doctors' notes that Jones provided to FCPS officials in support of her request for an accommodation. The first three notes, provided on February 7, February 15, and April 25, 2022, respectively, state that Jones's condition "should improve when not exposed to mold," together with the recommendation that in order for "FCPS to assist the employee to perform … her job functions" FCPS should "ensure no mold exposure at work." [Def. Exs. 11, 13, 20]. As an alternative to a mold-free work environment, the treating physician, Dr. Halabi, recommended "teleworking to avoid mold exposure at work." *Id*. The last

9

note, sent on May 12, 2022, indicates that because Jones's condition could also be exacerbated by construction dust, Jones should not be exposed to dust as well as mold. *See* [Def. Ex. 21].

FCSB submits that it did as Dr. Halabi suggested by offering a mold-free working environment, and later, as Dr. Williams suggested, by offering a mold- and dust-free environment. Specifically, FCSB contends (and the record shows) that it conducted indoor air quality ("IAQ") testing in Jones's room, offered her alternative rooms from which she could work on campus, and provided her with air purifiers. [Doc. No. 50] at 17. FCSB also contends that even before receiving Dr. Williams's recommendation about the dust, the school moved Jones to a trailer on campus but away from the construction dust. *Id.* at 22.

In her opposition, Jones argues that the IAQ testing was largely visual and therefore deficient, and that in a lab analysis conducted in December 2021, just two months prior to Jones's request for the remote work accommodation, it was found that there were "elevated" levels of mold in the resource room from where she worked. [Doc. No. 68] at 13. She also argues that even when she was relocated to the trailer, she was forced to walk by the building that was under construction, as reflected in various photographs submitted as exhibits, which show that the path Jones took to her trailer was in the vicinity of construction. [Plf. Ex. 2] at 6–13. Finally, at oral argument, Jones argued that although her physician's note specified mold as an environmental cause, Jones had made it clear in her written accommodation requests that mold was not the only trigger for her disability, and that she had other concerns that were not addressed by the mold eradication, including masking around others, and that Braddock school officials ignored these concerns.[4]

---

[4] At oral argument, Jones explained that while she needed to wear a mask around others to protect herself from COVID-19 because her condition made her susceptible to complications, her RAD condition was worsened by wearing a mask and speaking through a mask for prolonged periods of time. This contention was not documented in

Here, the record contains strong evidence that FCPS provided a reasonable accommodation to Jones, and certainly acted in good faith in trying to do so in the manner that her treating physicians advised and within the confines of her job requirements. Specifically, the record reflects that Braddock school officials conducted mold eradication in Room 38, repeatedly tested Jones's work rooms (Room 38 and Room 34) for mold, provided air purifiers to Jones for each room, and allowed her to select from alternative rooms. [Def. Ex. 1] at 44, 58–68; [Def. Ex. 3] at 77–79; [Def. Ex. 8] at 103–104, 106, 115; [Def. Ex. 10]. After Jones submitted her ADA forms, FCPS offered Jones the opportunity to work remotely on Thursday mornings through spring break, and Jones was offered additional PPE. Jones formally accepted the offer in writing, which she did not seek to revisit until almost two months later, at which point she ultimately declined to reopen the interactive process and advance to the next stage in the accommodation process. [Plf. Ex. 5] at 49 ("The answer is yes."); *id.* at 66 ("I never insinuated that I wanted to rescind my accommodations…."). Finally, following spring break, school officials placed Jones in the A-3 trailer that was further from the active construction, even before they learned from her new treating physician that construction dust could aggravate her condition. [Def. Ex. 4] at 89–91, 155–57; *see also* [Def. Ex. 22].

Despite this undisputed evidence, the record does not sufficiently establish for the purposes of summary judgment whether or not there was mold and dust in Jones's working environment at levels that adversely affected her RAD while recovering from her RAD surgeries.[5] As a result, the

---

her physician's notes, but Jones did make various requests related to masking—her own masking and the masking of others—in the correspondence between Jones and Gibson and Jackson-Muir. *See, e.g.*, [Plf. Ex. 5] at 61, 68, 77.

[5] *See, e.g.*, [Doc. No. 68] at 11–12 (citing [Plf. Ex. 12-D] at 50–61) (deposition testimony that IAQ testing is not without errors and would not detect lingering mold spores that could trigger a RAD reaction); [Def. Ex. 9] (laboratory analysis found elevated levels of mold in December of 2021); *but see id.* (same lab analysis notes that "[d]uring the heating season (winter), any indoor [mold] counts may appear to be elevated due to the significantly decreased number of outdoor molds. Aerobiology Laboratory Associates typically cites spore counts of up to 1000 for any one mold group or species to be acceptable for good indoor air quality. These results were well below that unofficial standard."). Given the likely existence of mold and dust at some levels in many, if not most environments, including environments

11

record does not allow the entry of judgment as a matter of law in either parties' favor on the issue whether FCPS offered Jones a reasonable accommodation. Rather, there exists a genuine issue of material fact, to be resolved by the factfinder at trial, concerning whether FCPS had actually offered—and not simply tried to offer—a reasonable accommodation.

### B. Jones has not presented evidence sufficient to establish a reasonable accommodation other than what FCPS offered her.

Assuming, without deciding, that FCPS failed to reasonably accommodate Jones in its attempt to provide a mold- and dust-free working environment, in order to prevail on her claim, Jones must still establish that an alternative reasonable accommodation existed that she would have accepted. *Perdue*, 999 F.3d at 962. Accordingly, FCSB has alternatively moved for summary judgment on the grounds that even if it did not offer a reasonable accommodation despite its good-faith efforts to do so, Jones has not introduced sufficient evidence to establish that the accommodation she repeatedly proposed—fully remote work on a temporary basis—would have allowed her to perform the essential functions of her job. [Doc. No. 53] at 22–26.[6]

As observed *supra* Part III.A, a reasonable accommodation is one that "enable[s] [a qualified] individual with a disability ... to perform the essential functions of [her] position." 29 C.F.R. § 1630.2(o)(1)(ii). The "essential functions" of a job are those "functions that bear more than a marginal relationship to the job at issue." *Tyndall v. Nat'l Educ. Centers, Inc. of California*,

---

Jones may have been exposed to away from school, such as her home, the record is silent as to whether Jones, in fact, required or requested a completely mold-free environment or an environment with mold and dust levels below a certain level.

[6] The record evidence is insufficient to show that Jones accepted or would have accepted short-term leave as an alternative reasonable accommodation, which FCPS through Gibson at one point suggested. *See, e.g.*, [Plf. Ex. 5] at 5 ("It is not about taking sick leave, it is about accommodating temporarily … so that I can avoid the ADA form."); *id.* at 6 ("Because you want to telework to avoid taking leave, not necessarily because of a disability, then that would fall under the telework provisions…."); *id.* at 7 ("I have plenty of sick leave, just wanted to be able to be part of my grade level CLT and other virtual meetings occurring the days following my surgery."); *see also* [Plf. Ex. 12-C] at 105:22-4 (confirming in Jones's deposition that she did not want to use sick leave). Indeed, in Jones's workers' compensation claim, she sought the reinstatement of the sick leave she ultimately did take. [Plf. Ex. 3] at 1.

31 F.3d 209, 213 (4th Cir. 1994).[7] Here, there is substantial agreement between the parties regarding the essential functions of Jones's position.[8] The parties disagree, however, as to the amount of time spent on each of those functions and on whether the functions could be completed in a fully remote environment.

Jones carries the burden of establishing that her essential job functions as a science and math resource teacher can be performed in a fully remote working environment, even on a temporary basis. *Womble Carlyle Sandridge*, 616 F. App'x at 593. Jones has submitted for that purpose her own affidavit describing her job functions and allocating a percentage of her time to "in-person" activities versus remote-capable activities.[9] [Plf. Ex. 2] at 3–4. In that regard, Jones details her various tasks in the categories of "data analysis and reporting," "collaborative curricular and administrative meetings," "curriculum adaptation and planning," "student and classroom support," "professional development and training," and "resource development." She submits that the first three categories of tasks, and four total, can be completed "fully remotely" and that she can complete "student and classroom support" and "resource development" partially remotely. *See id.*] at 2–3 ("85% of my duties and responsibilities are or can be performed online or remotely.").

---

[7] Jones cites to this definition of the applicable test in her brief in support of her motion for summary judgment, *see* [Doc. No. 53] at 32, but in her Reply later contends that "[a] job function is essential when 'the reason the position exists is to perform that function,' when there aren't enough employees available to perform the function, or when the function is so specialized that someone is hired specifically because of his or her expertise in performing that function." [Doc. No. 74] at 12 (quoting *Cook v. United Parcel Serv., Inc.*, 2022 WL 1090251, at *1 (4th Cir. Apr. 12, 2022)). This alternative articulation of the applicable test is written in the disjunctive, such that a position performs an essential function if the job exists to perform that function; and on the undisputed facts of this case, the result is the same under either articulation of the applicable test.

[8] As explained below, Jones does not agree that substitute teaching is an essential function of her job, though she conceded in her deposition that she was asked to substitute teach due to staffing shortages. [Plf. Ex. 12-C] at 195–96.

[9] Jones has also submitted the declaration of Monica Kim, another resource teacher who formerly worked at Braddock, in which Ms. Kim states that she "would expect that Donna would be an effective resource and responsible to perform her job duties remotely." [Plf. Ex. 17]. She does not state, however, that Jones could perform all of the essential functions of her job remotely, and in any event, her conclusory subjective statement in the nature of an expert opinion is plainly insufficient to stave off summary judgment. *Id.* at 1. In fact, Ms. Kim attached a high-level summary of the responsibilities of a school resource teacher, which includes responsibilities that appear to require in-person performance, such as "partner[ing] with teachers in the classroom." *Id.* at 3.

For the purposes of her obtaining or defeating summary judgment, there are substantial grounds for disregarding Jones's affidavit as competent evidence as to whether she can perform remotely the essential functions of her job. First, "the decision about a position's essential functions belongs, in the first instance, to the employer; it accordingly merits considerable deference from the courts." *Cook*, 2022 WL 1090251, at *2 (citing *Elledge v. Lowe's Home Centers, LLC*, 979 F.3d 1004, 1013 (4th Cir. 2020)). "Thus, courts must consult the full range of evidence bearing on the employer's judgment, including the testimony of senior officials and those familiar with the daily requirements of the job." *Id.* Here, FCPS officials consistently reported that Jones's position required meeting with teachers and students in person. [Def. Ex. 2] ¶¶ 4–5; [Def. Ex. 3] at 85; [Def. Ex. 1] at 36.

Second, Jones's claim in her affidavit that some of these categories can be completely performed remotely is undermined by her own deposition testimony. *See Bickenstaff*, 196 F.3d at 455 ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that ... contradicts the affiant's previous deposition testimony."); *Kennedy*, 952 F.2d at 266 (observing that a party cannot create issue of fact by contradicting its own prior evidence). For example, in her affidavit, she states that she could perform remotely her duties with respect to "curriculum adaptation and planning," and 85-percent of her duties overall. [Plf. Ex. 2] at 3.  But in her deposition, when asked why she had returned to working in Room 38 despite her concerns about mold in that room, she stated "I was not asked to use it, but *I had to access materials and resources*, and everything that I procured for teachers and planned for teachers, all the bookshelves with all the professional literature is all in that room. *So whenever I'm planning, I had to constantly access that room*." [Def. Ex. 1] at 67 (emphases added). Similarly, in her affidavit, Jones says that her "assigned functions or duties ascribed … did not

14

include" substitute teaching or covering for absent teachers—a function that would require her to be present at the school for on-call needs. [Plf. Ex. 2] at 3. But in Jones's deposition, she conceded that it was "a practice" for FCPS to use resource teachers like Jones to cover classes for absent teachers. *See* [Plf. Ex. 12-C] at 195–96 (acknowledging that she "probably" served as a substitute teacher on about five occasions in the spring of 2022).

Likewise, there are in the record inconsistent statements by Jones about the amount of time that she spent assisting teachers in person. It is undisputed that FCPS allowed Jones to work remotely—as it did all teachers—on Thursday mornings for the collaborative grade-level meetings ("CLTs"). [Doc. No. 50] at 11; [Doc. No. 68] at 33. In her affidavit, Jones appears to state that her interactions with teachers were limited to these Thursday morning CLTs, which she says required 3-6 hours of her time per week, essentially stating that the Braddock teachers would not have been burdened by her working remotely. [Plf. Ex. 2] at 3. However, in her deposition, Jones essentially stated that her support for teachers far exceeded the 3-6 hours on Thursday mornings and required her presence in the classroom for that function. *See* [Def. Ex. 1] at 17–18 (stating she had little time to meet with students, despite wanting to, because she was supporting "30 to 50 teachers per week," modeling for teachers how to use the materials "*in their own classroom*," so there was "little time left" for students) (emphasis added). This testimony about her routine, in-person collaboration with teachers in the classroom is corroborated by emails regarding the request for accommodation from Gibson to Jones in which she was told that the in-person essential functions of her job include "working collaboratively with teachers to provide support with academics *and modeling for teachers*," among other things. [Plf. Ex. 5] at 60 (emphasis added). The affidavit with the breakdown of her weekly time does not seem to account for this significant "modeling" time

15

spent with teachers in the classroom, despite deposition testimony indicating that this was a significant part of Jones's job.

But even assuming that her affidavit should be credited as evidence for the purposes of defeating summary judgment, Jones does not contend that any of the tasks that concededly required her in-person presence are only "marginally relevant" and therefore not essential functions within the meaning of the ADA. Rather, Jones seems to argue that because these tasks take up *less time* than other tasks that can be done remotely, her fully remote work request was reasonable. *See* [Doc. No. 53] at 8 ("For the period of time between January 30, 2022 and June of 2022, Plaintiff believed she could perform *the substantial amount* of her job function remotely.") (emphasis added). Even if she were correct in her time allocations with respect to these in-person tasks, she nevertheless concedes in her deposition that there was no set schedule for the in-person essential functions such as student assessments, and according to her own testimony she could be asked "at random times" to "get [students] and test them."[10] [Def. Ex. 1] at 20.

Jones also argues that there were other resource teachers who could have covered her in-person tasks on a temporary basis while she was out of work, [Doc. No. 74] at 12, and that "[m]any FCPS schools do not have resource teachers and still manage to conduct operations," *id*. at 14. This contention fails on two grounds. First, although employers like FCSB must provide reasonable accommodation to assist qualifying employees in accommodations that would allow them to perform the essential functions of their jobs, "employers do not need to change a job's essential functions or split them across multiple employees." *Elledge*, 979 F.3d at 1013 (citing 29

---

[10] Jones appears not to contest, and the record does not establish any basis to dispute, that Jones needed to be in person for these student assessments. As FCSB argued at the hearing, it would be objectively unreasonable to conclude that conducting student assessments remotely via Zoom (for kindergarteners, first and second graders) while those students were in-person at Braddock would be feasible without additional in-person supervision and support from classroom teachers, and school officials communicated to Jones that particular need for her in-person presence during the interactive process. *See* [Def. Ex. 4] at 52:6–53:18.

C.F.R. app. § 1630.2(o); *Shin v. Univ. of Md. Med. System Corp.*, 369 Fed. App'x 472, 482 (4th Cir. 2010)); *see also E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 317 (4th Cir. 2008) ("If an employer reasonably believes that an accommodation would … impose more than a de minimis impact on coworkers, then it is not required to offer the accommodation.") (internal quotations omitted); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995) (observing that the ADA does not mandate accommodations that would require other employees to work "harder or longer"). As such, even if it were possible for other resource teachers to take on some of Jones's responsibilities for in-person work, the availability of such an arrangement would not establish that there existed a reasonable accommodation that enabled her to perform all of the essential functions of her position. *See id.*

Second, there is no record evidence to support the contention that other resource teachers could have provided coverage or that the school could have managed without them altogether, and indeed, her own testimony is inconsistent with any such contention. Specifically, Jones testified in her deposition that she was one of two science and math resource teachers, and that she was added to the math curriculum because "[one] elementary resource teacher wasn't able to handle all of the classes. It's a large school." [Def. Ex. 1] at 13–14. Jones went on to explain that because of the workload, in 2020, "it was determined that [the two resource teachers] would split the science and math," with Jones handling kindergarten through second grade and the other resource teacher handling third grade through sixth grade. *Id.* at 14. She described this divided workload as "very demanding." *Id.* at 16.

Thus, for all the above reasons, Jones has not presented evidence that when viewed in a light most favorable to her would allow a factfinder to conclude that she could have performed all of the essential job functions from a completely remote location, even on a temporary basis.

## IV. CONCLUSION

For the foregoing reasons, neither party has presented undisputed facts that entitle either party to judgment as a matter of law on whether or not the accommodations FCPS offered were reasonable; and Plaintiff has failed to present evidence that when viewed most favorably to her is sufficient to carry her burden of showing that an alternative reasonable accommodation existed that she would have accepted and which would have allowed her to perform the essential functions of her job. Accordingly, it is hereby

**ORDERED** that the FCSB motion for summary judgment be, and the same hereby is, **GRANTED**; and it is further

**ORDERED** that Jones's motion for summary judgment be, and the same hereby is, **DENIED**; and it is further

**ORDERED** that this action be, and the same hereby is, **DISMISSED.**

The Clerk is directed to forward copies of this Order to all counsel of record and enter judgment in favor of Defendant FCSB pursuant to Fed. R. Civ. P. 58.

Alexandria, Virginia
April 19, 2024

Anthony J. Trenga
Senior U.S. District Judge